I concur in the result. United States v Coleman, 19 USCMA 524, 42 CMR 126 (1970).

UNITED STATES, Appellee

v

YOUNG CLAUDE GRAY, Private First Class,
U. S. Marine Corps, Appellant

20 USCMA 63, 42 CMR 255

No. 22,546

August 28, 1970

*Melvin L. Wulf, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Brook Hart, Esquire, Edward F. Sherman, Esquire, Lieutenant Allen D. Black,* JAGC, USNR, and *Lieutenant Scott M. Feldman,* JAGC, USNR.

*Lieutenant James E. Akers,* JAGC, USNR, argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Charles J. Keever,* USMC, and *Lieutenant Thomas F. Bastow,* JAGC, USNR.

## Opinion of the Court

QUINN, Chief Judge:

Along with other offenses, the accused was convicted by a general court-martial of publicly making, with design to promote disloyalty and disaffection among the troops, two separate statements disloyal to the United States. We granted review to determine whether the allegations of each specification state an offense, and, if so, whether the evidence is sufficient to support the findings of guilty.

At the time of the commission of the offenses, the accused was nineteen years old. He had joined the Marine Corps when he was seventeen. While stationed in Yuma, Arizona, about a year after enlistment, his conduct brought him before a summary court-martial. Three months later he was convicted by a special court-martial for other misconduct. About July 1968, he reported to Headquarters and Headquarters Squadron Marine Corps Air Station, Kaneohe Bay, Hawaii, and was assigned to the Crash Crew section. Staff Sergeant Theodore R. Battle interviewed him in connection with the assignment. They talked about the responsibilities of the job, the accused's "off duty education and stuff of this nature." The accused's "previous trouble in Yuma," was discussed and the accused was assured he would start with a "clean slate as long as he did his job." Apparently, the accused performed well. The officer in charge of the Crash Crew,

Lieutenant Ira L. Sylvester, and Sergeant Battle testified that he presented no disciplinary problem from August to October 1968, and that his performance of duty was "very good—above average." Then "[a]ll of a sudden this thing happened."

About 11:00 p.m. on October 15, 1968, the accused appeared in the dispatch office of the Crash Crew section. Corporal Richard Perez was on duty. The accused offered to "stand the rest" of Perez' watch for thirty-five cents, which was all the money Perez had on his person. Since it was a "regular practice" for Crash Crew members "to trade off a watch" in this manner, Perez gave the accused the money and left the office.

On October 17, the accused was reported as absent without authority. That morning, Lance Corporal Thomas J. Met, as was his custom when he had "nothing else to do," appeared at the dispatch office to read the "rough" log kept at the office. The log contained entries connected with the section's activities and personal and anonymous remarks, drawings, literary quotations, and the like. Corporal Met found a letter in the log. It was dated October 15, 1968, addressed "Dear fellow member's of crash crew," and was signed "Mr. GRAY." The text of the letter is set out in Appendix A. Met read the letter aloud to the persons present in the dispatch office, Lance Corporal R. B. Thursby and Lance Corporal Will K. Hoggarth, Jr. He then left to bring the letter to the head of his own section, but met Staff Sergeant A. R. Battle, Jr., and read it to him. Battle took custody of the letter and later delivered it to the officer in charge. The letter is the subject of the first of the two disloyal statement specifications.

The accused remained away without authority until October 28, 1968. He had left Hawaii on October 16, and had gone to California. Some evidence suggests that he intended not to return, but the court-martial found him not guilty of entertaining the intent to remain away permanently, either at the inception of, or during, his absence. On October 28, the accused surrendered himself as an absentee at Travis Air Force Base, California, and, as directed by "stragglers" orders issued to him, returned to the Marine Corps Air Station at Kaneohe Bay on November 10, 1968. However, the next day he again absented himself without authority.

For several days, the accused stayed on the campus of the University of Hawaii, or in its vicinity, under a right of "sanctuary" asserted by a campus peace group. On Sunday, November 17, he, Corporal Met, who was then also an unauthorized absentee, and about ten other persons appeared in chains at a church. Their appearance had been publicized in the newspapers, and members of the communication media were present at the church to observe the proceedings. Also present was Gunnery Sergeant William W. Hamby, a member of a Marine Corps counter-intelligence team. On entering the church, Hamby had been handed a statement titled:

"A CALL TO JOIN US:

A JOINT STATEMENT OF TWO MARINES
Young Claude (Gary) Gray
Tom Met."

The text is set out in Appendix B.

According to Sergeant Hamby, about fifty to seventy-five persons were present in the church. Among them were several clergymen. One of the clergymen described the proceedings as "a celebration of freedom of conscience." The celebration consisted of the singing of songs, such as, "Written in the Wind," "Down by the Riverside," and "White Boots in a Yellow Land." When the accused and the others chained to him appeared in the church, the assemblage was singing "He's Got the Whole World in His Hands"; the singers changed the words of the song to "We've got two ex-Marines in our hands." The accused read the statement which Hamby had received on entering the church. He "faltered" several times

in the course of the reading, partly because he was "emotional" and partly because he kept "losing his place." The statement is the subject of the second specification in issue.

After the accused read the statement, there was a brief "think and concentrate" period. Then, those in attendance were asked to go to the Kailua School to "organize again and proceed to march to the air station." At the school, about fifteen to twenty persons gathered for the march. Some carried placards reading, "The Resistance"; "Support Tom and Gary"; and "Make peace not war." The accused carried no sign, but marched at the front of the group as it proceeded toward the main gate of the air station. By the time the group reached the gate, there were an estimated one hundred and twenty-five to one hundred and fifty persons in the line of march. About twenty-five military persons were present as spectators; about another seventy-five spectators were people who "lived along the Mokapu Road," which apparently ran adjacent to the air station. In front of the gate, the marchers formed a semicircle and sang hymns. The accused read another statement over a bullhorn. This statement was the subject of a third disloyal statement charge, but the accused was acquitted of it. The accused and Corporal Met then "presented themselves into military custody" through Major Clement D. Timoney, who had been sent to the main gate on a report from the "news media" that there would be a "demonstration." Major Timoney testified that no "disorder" and "no incidents" occurred at the gate.

Servicemen, like civilians, are entitled to the constitutional right of free speech. The right of free speech, however, is not absolute in either the civilian or military community. United States v Daniels, 19 USCMA 529, 42 CMR 131 (1970); United States v Harvey, 19 USCMA 539, 42 CMR 141 (1970). The point of curtailment of the right is not, and perhaps in most instances cannot be, delineated in template form. Some restrictions exist of necessity in the armed forces which have no counterpart in the civilian community. Speech disrespectful or contemptuous of a public official may be tolerable in the civilian community because it does not directly affect the official's capacity to discharge his public responsibilities (see New York Times Co. v Sullivan, 376 US 254, 11 L Ed 2d 686, 84 S Ct 710 (1964)), but similar speech by a subordinate toward a superior in the military can directly undermine the power of command; such speech, therefore, exceeds the limits of free speech that is allowable in the armed forces. See Articles 89–91(3), Uniform Code of Military Justice, 10 USC §§ 889–891, respectively. We reviewed some of the problems in this area in the *Daniels* and *Harvey* cases, and we need not now retrace the ground. Suffice it to reaffirm the conclusion that the public making of a statement disloyal to the United States, with the intent to promote disloyalty and disaffection among persons in the armed forces and under circumstances to the prejudice of good order and discipline, is not speech protected by the First Amendment and is conduct in violation of Article 134, Code, supra, 10 USC § 934.

We turn now to the particulars of specification 2, Charge IV. By way of review, the two questions for consideration are the sufficiency of the allegations to charge the offense of making a disloyal statement and the sufficiency of the evidence to support the findings of guilty. Regarding the allegations, the only serious matter in dispute is whether the language of the statement can fairly be construed as disloyal to the United States. See United States v Harvey, supra. Appellate defense counsel concede that the language of the specification is "quite strong," but they contend the statement constitutes only an expression of "personal beliefs about political and military matters."

A declaration of personal belief can amount to a disloyal statement if it

disavows allegiance owed to the United States by the declarant. ■■■■■ The statement set out in ■■■■■ the specification declares that the accused is leaving Hawaii for Canada or another foreign country. Although it does not directly indicate that the accused intended to leave without authority, the text implies as much. It is also fairly inferable that the accused decided to remove to a foreign country because of the foreign policy of the United States, which inescapably called to mind the Vietnam war, and the "unjust Rules" of the Marine Corps and the Government, which apparently had their origin in the farcical provisions of the Constitution. The accused portrayed his flight as part of a "Struggle for Humanity," and asked others to join him in that "fight." Clearly, the enemy in this "fight" was the United States. It may indeed be true, as appellate defense counsel movingly argue, that in the callowness of his youth and the attenuation of his education, the accused did not foresee the consequences of his conduct (cf. CMO, 1-1942, 269–270), we must, however, take the accused's words, and the reasonable inferences they raise, as we find them. In our opinion, reasonable persons could conclude that the statement was a disavowal of the allegiance the accused owed to the United States.

So far as the evidence is concerned, there is no real dispute as to the finding that the statement was made by the accused. Our discussion of the nature of the statement indicates that the court members could reasonably find that it was disloyal to the United States. Seizing upon the informal and unofficial nature of the logbook in which it was found, appellate defense counsel contend there is "no proof at all that the statement affected the loyalty of any military personnel." Successful propagation of disloyalty is not an essential element ■■■■■ of the offense. United States v Harvey, supra. However, the argument draws into question whether the evidence proves the required intent to promote disloyalty.

A casual reading of the rough log leaves the distinct impression that it is not a likely or effective medium through which to disseminate a serious statement with the intention that it influence others to act in a particular way in a matter of great importance to them. To a considerable degree, therefore, the ac- ■■■■■ cused's selection of the rough log as the means of publication militates against a finding that he entertained an intent to promote disloyalty and disaffection among the members of the Crash Crew. Still, there is substantial other evidence from which the court members could conclude the log was not an inappropriate or useless means by which the accused could communicate with the Crash Crew members with the intention of influencing their attitudes and conduct. The court members could reasonably find that the accused took over Corporal Perez' watch in the dispatch office for a nominal fee so that he could have uninterrupted and unseen access to the log; it could find that the accused knew of, and relied upon, the "regular practice" of the Crash Crew members to read the log, and that his form of address would insure that the statement would be widely read and discussed; and it could find that, notwithstanding the log contained jokes and doodlings induced by the boredom of uneventful and lonely tours in the dispatch office, the accused believed his statement would receive serious consideration. Publication of the statement was actually made by Corporal Met. His action, however, was the logical and anticipated result of the course chartered by the accused. The court members could, therefore, conclude that Met was merely the accused's instrument to effectuate publication of his statement.

One further matter for consideration is whether publication of the statement was made under circumstances sufficient to constitute a violation of Article 134. Since the state-

ment was published on a military reservation and only military persons were involved, the evidence must establish "reasonably direct and palpable" prejudice to good order and discipline. United States v Snyder, 1 USCMA 423, 425, 4 CMR 15 (1952); see also United States v Williams, 8 USCMA 325, 24 CMR 135 (1957).

The accused's previous good conduct in the performance of his duties in the section supports an inference that the Crash Crew members would weigh his declarations differently from the cant of a known incompetent or malcontent. Met testified that when he read the statement to Thursby and Hoggarth he did not "take . . . [it] seriously" and he "laughed" when he completed his reading of it. He also "believe[d]" that Thursby and Hoggarth made a "humorous response" to the statement, but he admitted that immediately after the reading, he went to bring the statement to his section head. Contradicting Met, Thursby testified that Met was "quite serious" when he read the statement. The court members could disbelieve Met and believe Thursby in assessing the potential impact of the statement.

At the time the accused inserted the statement in the logbook, there were a number of earlier entries expressing complaints about harassment of lower ranking members of the Crash Crew by "lifers." These entries suggest that the accused's statement was not addressed to an audience so inhospitable to discontent as to foreclose all possibility of successful promotion of disloyalty and disaffection among other members of the Crash Crew. See United States v Daniels, supra. The evidence is thus sufficient to support a finding of reasonably direct prejudice to good order and discipline. We conclude, therefore, that the evidence is legally sufficient to support the findings of guilty of specification 2, Charge IV.

The written statement distributed at the church, which is the subject of specification 3, Charge IV, is certainly a denunciation of the armed forces in general and the Marine Corps in particular. What it means in terms most favorable to the prosecution is perhaps best determined from the viewpoint of Government counsel. At the trial, Government counsel described the statement as "question[ing] the regulations of the Marine Corps and its practices" and thereby "caus[ing] disaffection, ill feeling, lack of obedience and allegiance." On this appeal, Government counsel conceive the statement as an "attention-getting" method by which the accused "solicited other members of the armed forces to join him in defying military authority." Defiance of, or disloyalty to, the Marine Corps is not tantamount to disloyalty to the United States as a political entity, which is the requirement of the offense charged. United States v Harvey, supra. As Government counsel describe the statement, therefore, it does not express disloyalty to the United States. A statement can acquire meaning beyond the immediate import of its language from the circumstances in which it is made. No circumstance, however, is set out in the specification which suggests in any degree that the statement means more than its words normally and naturally indicate.[1] Giving the statement its widest possible meaning, we are still left with an abiding conviction that it does not constitute a declaration of disloyalty to the United States. Consequently, the findings of guilty of this charge must be set aside.

The decision of the United States Navy Court of Military Review is reversed as to specification 3, Charge IV, and the sentence, and the specification is ordered dismissed. The record of trial is returned to the Judge Advocate General of the Navy

---

[1] The evidence negates the existence of any hidden meaning in the statement. Nothing that transpired at the church or on the march to the air station even remotely implies disloyalty to the United States.

for submission to the Court of Military Review for reassessment of the sentence on the basis of the remaining findings of guilty.

Judge DARDEN concurs.

Judge FERGUSON concurs in the result.

## APPENDIX A

"Dear fellow member's of crash crew

"As I write this I have but a few hours left on this island. Surely you know why, but where did I go? I'm not to sure right now but I have hopes of Canada, then on to Sweden, Turkey, or India.

"It sounds silly to you? Let me ask you this: do you like the Marine Corps? The American policy or foreign affairs.

"Have you ever read the constution of the United States. IT'S A FARCE. Everything that is printed there is contradicted by 'amendments.' is this fair the U S people? I believe not. Why set back and take these unjust Rules and do nothing about it. If you do nothing will change.

"This is what I'm doing, A *Struggle for Humanity*. But it takes more than myself. We must all fight.
/s/ Mr. GRAY."

## APPENDIX B

"A CALL TO JOIN US:

A JOINT STATEMENT OF TWO MARINES
Young Claude (Gary) Gray
Tom Met
\*   \*   \*   \*   \*   \*

"Yesterday at the beginning of sanctuary we spoke in general terms of our opposition to the present military system of life and the system of death it operates in Vietnam.

"Today we would like to be more clear and specific on the grounds of our opposition.

"It is true that we both 'volunteered' for the Marine Corps. I (Gary) was raised in a family of long-standing military tradition; to volunteer and serve in the military was the accepted way of being a true red-blooded American. Both of us were confronted with the draft (Tom having already received his induction papers) and the prospect of killing other men, both of us enlisted in the air-wing of the U. S. M. C., a non-combatant group. We, like most other men, hate killing, especially for questionable reasons or at command.

"We first became aware of the *true* nature of the Marines at boot camp, where we were trained to behave like robots or animals. In bayonet practice, for instance, we were lined up with several hundred other men to rehearse stances and strokes, and at every movement we shouted together —'kill . . . kill . . . kill.' Another instance, Marine was pitted against Marine and friend against friend in pugil stick combat. With padded sticks young men clubbed each other trying to strike what the judges would rule to be a killing blow. From fifty feet apart, two men would rush at each other full-speed with pugil sticks and try to job each other in a critical spot. One day this practice turned into a general riot; with men beating up other men for no reason. One man had his leg broken and many lost teeth or were knocked senseless. This is an example of the general tendency in boot camp to vent numerois frust rations by trying to hurt the other guy as much as you can. We were frequently threatened with physical punishment being told 'if you don't do so and so, you'll get the hell beaten out of you.' We were given several classes on the war while in boot camp, and the usual line was that the Viet Cong are your enemy, attendance at church was compulsory in boot camp, but if a guy happened to be a Buddhist, he had to go to the Catholic or Protestant service.

"In general, church services served well for war propaganda. I (Gary) have never met a chaplain against the war. Our present disgust with the service developed as we served longer. Basically, infringements were made on intellectual development and free-

**69**

doms. Article 134 of the Uniform Code of Military Justice is a catch all in the code, forbidding anything 'unbecoming' of a Marine, for instance, our present protest action. We find it interesting to infer what is *not* 'unbecoming' of a Marine from the gist of General Chesty Putter's contentions that the best Marines are found in the brig, and that beer halls and houses of prostitution should be located on base. Are these 'best Marines' America's best representatives abroad?

"Another item considered to come under Article 134 is that literature detrimental to Armed Forces morale is forbidden. This does not serve free expression of ideas.

"Non-commissioned officers (NCO's) must go through special courses, which in themselves are good leadership courses. The problem is that the candidates for these courses are often 'lifers' who have entered the Corps after high school, or earlier, and who very often simply do not have the mental ability to benefit from the courses. Most NCO's have gotten their rank from extended service and unquestioning obedience, rather than from ability. The NCO has never questioned, and does not expect questioning by his men. We often see him as our real enemy, because of his constant harrassing. Many NCO's end up as alcoholics because of pressure from the higher ranks and ill-feeling from the lower ranks.

"The whole business of ranks and prestige is exaggerated. Men lower than NCO are hardly treated like human beings and the 'super-brass' tend to be treated like gods.

"What does all this have to do with the war in Vietnam? The Marines, the military in general, are teaching men to respond like animals, to kill without question and on command, and in Vietnam without reason, without cause.

"We have not served in Vietnam but we have not been deaf or blind to the testimony or our brothers who have gone and were lucky enough to return. In the brig, one meets Vietnam veterans and conscientious objectors, and from them one gets a different view of the war. In the barracks we talk to each other; at demonstrations we have read leaflets and pamphlets. We have heard and encountered both sides of the war. We have heard the death tolls calmly announced over TV and radio. We have read of whole villages wiped out by our forces accidently, and we have reason to believe our war there is a huge mistake made possible in part by inhumane and dictatorial practices within the military. We can no longer cooperate with these practices or with the war in Vietnam. We are not deserting; we are simply taking a stand to help others like us.

"Positively, we favor an immediate end to the war and the establishment of a voluntary military service to defend the nation, together with the needed reforms within the military to attract volunteers. Article 134 should be struck from the code, free speech guaranteed and individual conscience respected; a conscientious objector's status should be easier to attain for those with moral doubts about a war. In general, soldiers should have a greater say about the rules they live under, and certainly about a matter of life and death, and the destruction of another country.

"This is where we stand, and we hope that other men in the Armed Forces who know that we speak the truth will stand with us.

Shalom."