UNITED STATES, Appellee

v

ROGER L. PRIEST, Journalist Seaman Apprentice, U. S. Navy, Appellant

21 USCMA 564, 45 CMR 338

No. 23,937

August 4, 1972

*David Rein, Esquire,* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Arthur H. Rainey,* JAGC, USNR.

*Captain Donald B. Myers, USMCR,* argued the cause for Appellee, United States. With him on the brief was *Commander Michael F. Fasanaro, Jr.,* JAGC, USN.

**DARDEN, Chief Judge:**

The accused's case has been here before. United States v Priest, 21 USCMA 64, 44 CMR 118 (1971). In that instance, we reversed the decision of the Court of Military Review because of instructional error and remanded the case for further consideration of other assignments. In its subsequent review, the court rejected accused's claims of error, and affirmed. We granted his petition on the issues whether the military judge erred in excluding certain evidence at the trial and whether the evidence is sufficient to sustain his conviction of two specifications of printing and distributing, with intent to promote disloyalty and disaffection among members of the armed forces, issues of a publication which, in its entirety, contained statements disloyal to the United States. He presently stands sentenced to a bad-conduct discharge and reduction in grade.

I

While on active duty in the naval service, the accused edited, published, and distributed an "underground" newsletter entitled "OM." Copies were left for free distribution to military personnel in the Navy Exchange, Washington Navy Yard, at a Pentagon newsstand, and were handed to individual members of the armed forces.

The accused does not contend that he was not responsible for the publication's contents and for its circulation among military personnel. He conceived it as a means of protest against United States involvement in Vietnam and the military establishment. Its purpose was "to persuade people to change their minds to do something else."

Accused declared that he considered his actions patriotic and loyal. Seeing many faults in our national and military behavior, as well as the supposed political ignorance of the average member of the armed services, he sought to agitate against the Vietnam war and those things he considered unjust in the armed forces. He apparently considered silence to be the equivalent of complicity in the injustices and illegalities that he condemned.

The two issues of the newsletter with which we are concerned were issued in May and June 1969. The lead article in the May issue is entitled "A CALL TO RESIST ILLEGITIMATE AUTHORITY AN INDICTMENT AGAINST THE U. S. GOVERNMENT, THE ARMED SERVICES AND ITS INDUSTRIAL ALLIES." This is specifically an attack on the United States for its involvement in Vietnam, in which the Government is accused of "waging aggressive war crimes against humanity, and with specific violations of the laws of war." The article portrays the United States as an aggressor, committing a horrendous crime "against a peasant people fighting to expel foreign oppressors from their homeland." It concludes with this statement:

"And to those who hold illegitimate power over our lives we say to you that we will not accept the continuation of this war. We will continue to resist; and we encourage others to do the same. SILENCE IS COMPLICITY."

The same issue contains antiwar poems and various quotations attributed to well-known persons and to members of antiwar groups. They uniformly indicate opposition to the Vietnam war and militarism in America. Many are intemperate, and one suggests the abolition of our society. Other comments and articles attack career military personnel ("the lifers") and the trial of certain soldiers. Of the latter, one comment is that:

". . . And if we do not get justice in the rigged courts of this land; then we shall turn to the streets. For the streets are the court of last resort in dealing with oppression. John F. Kennedy said, 'Those who make nonviolent revolution impossible make violent revolution inevitable.'

**566**

Shall we ask the Military-Industrial Complex which way they would like it?"

The May issue also sets forth explicit information on how servicemen wishing to desert the armed forces may enter Canada and receive assistance from such groups as the American Deserters Committee, Toronto Anti-Draft Programme, and Vancouver Committee to Aid War Objectors. Another article points out that 53,357 servicemen have deserted the armed services and notes that the accused would not himself desert but would stay and fight from within. He indicated, however, that he had not been subjected to the alleged sadism of military guards or other pressures that might bring him to a breaking point, and concluded with the thought:

". . . And to those who make the decision to stay and fight or leave and (fight?) I wish you the best of luck. There are many ways of bringing this rotten system down to its knees. Perhaps a combination of the two might work?"

A final article calls attention to the American Servicemen's Union, sets forth its program, and lists the organization's address from which the article declared more information can be obtained.

The theme of the June issue is not unlike that of the May issue. Its language is somewhat more violent. For example, it suggests the velocity with which the Vice President would strike the pavement if he was pushed or fell from the Empire State Building. It quotes Che Guevara on the " 'futility of maintaining the fight for social goals within the framework of civil debate.' " It attributes to one Phil Ochs a statement that:

"Ah, but some time later
When I feel a little safer
We'll assa[ss]inate the President
And take over the government
And then we're going to fry them!"

The issue also demands that the former Director of the Federal Bureau of Investigation cease investigating the accused and warns him that "When the revolution comes, you will be the grass, and we will be the lawn-mower. So, take care." It then declares, "TODAY'S PIGS ARE TO-MORROW'S BACON."

The issue includes a formula for gunpowder, states "WE WILL USE VIOLENCE" to defend the people against suppression, and in various cartoons, slogans, and statements ridicules the armed forces and suggests means by which they may be weakened from within.

Other quotations indicative of the tenor of the June issue are:

"WE MUST STOP THE CAPITALIST CORPORATE POWER STRUCTURE FROM KILLING US, TAXING US, DIVIDING US AND RULING US. WHY DO WE HAVE CAPITALISM, IMPERIALISM AND AN ECONOMY BASED ON MILITARISM?"

"THE TIME HAS COME TO FAIL THE SYSTEM. IT ONLY USES US TO PERPETUATE ITSELF TO SERVE THE SYSTEM IS TREASON."

"SMASH THE STATE POWER TO THE PEOPLE."

"FREE US NOW GUNS BABY GUNS!"

"WE WILL STOP AT NOTHING TO STOP THE VIETNAM WAR, AND THE POWER ARRANGEMENTS THAT MADE IT POSSIBLE. WE TAKE THAT 'NOTHING' SERIOUSLY."

"DESTROY THAT SACRED COW OF CAPITALISM—PROPERTY."

"BOMB AMERICA. MAKE COCA-COLA SOMEPLACE ELSE."

"OUR GOAL IS LIBERATION . . . BY ANY MEANS NECESSARY."

II

We consider first the sufficiency of the evidence to support the findings of guilty. Appellate defense counsel contend that the evidence is inadequate in three ways: (1) that

neither pamphlet was, taken in its entirety, disloyal to the United States; (2) that there was no design on accused's part to promote disloyalty and disaffection among servicemen; and (3) that accused's conduct was, under the circumstances, not prejudicial to good order and discipline.

"A declaration of personal belief can amount to a disloyal statement if it disavows allegiance ▮▮ owed to the United States by the declarant." United States v Gray, 20 USCMA 63, 66–67, 42 CMR 255 (1970). The disloyalty involved must be to the United States as a political entity and not necessarily to a department or other agency that forms a part of its operative administration. United States v Harvey, 19 USCMA 539, 42 CMR 141 (1970). And, as we said in *Harvey*, at pages 543–544:

> "Some statements may be so explicit in meaning as to support a conclusion from their language that they are disloyal to the United States. Other statements require interpretation; and their real nature may be discernible only in the context of the circumstances of their utterance. Words by themselves may not always reveal their character. Watts v United States, 394 US 705, 22 L Ed 2d 664, 89 S Ct 1399 (1969)."

The statements in the May and June issues of "OM" require little interpretation. Taken in ▮▮ its entirety, each issue is a call to violent revolution against our Government as an institution because of its role in the Vietnam war. That war has been the subject of extensive written and oral comment from persons in all walks of life —from incumbents of high elected and appointed offices to street practitioners of physical coercion and violence. We have noted that some of these are "poised on a thin line between rhetoric and disloyalty to the United States." United States v Harvey, supra, at page 544. The accused's writings leave little doubt as to his position.

As we indicated earlier, the lead article in the May issue is an indictment of the United States and a call to resist its "illegitimate authority." The accused suggests turning to the streets and the possibility of violent revolution against the United States. He expressly provides information to encourage members of the armed forces to abandon their oaths and seek sanctuary in a foreign haven. In sum, and in his own words, he sets forth means that will bring "this rotten system down to its knees."

The language of the June issue is even more virulently indicative of the author's abandonment of allegiance to our Nation. While much of the language comes from quotations attributed to others, this issue suggests the assassination of the President and the death of the Vice President. The author seeks to persuade the reader that relief is no longer to be found within the confines of civil debate but that violence is necessary to defend the people against suppression. Property is to be destroyed. "GUNS BABY GUNS . . . LIBERATION BY ANY MEANS NECESSARY" is the call for action. In the accused's own words, "WE WILL STOP AT *NOTHING* TO STOP THE VIETNAM WAR, AND THE POWER ARRANGEMENTS THAT MADE IT POSSIBLE. WE TAKE THAT 'NOTHING' SERIOUSLY."

We judicially note, as did the military judge, that many persons, prominent and otherwise, oppose the United States involvement in Vietnam. Such views, even when extremely critical of the Government's policies, are not disloyal, and we do not consider them to be so. But ordinarily the loyal opposition seeks change in the Government's behavior by constitutional means. Every citizen has the right of petition for redress of his grievances and to seek alteration of the Government's course by the exercise of his franchise to elect those who espouse his viewpoint. As outlined above, the accused's actions establish his abandonment of change by constitutional means and adoption of violence as the

method by which his viewpoint is to be imposed on the United States. This far exceeds mere opposition to the Vietnam conflict.

As we said in United States v Gray, supra, at page 67, "we must . . . take the accused's words, and the reasonable inferences they raise, as we find them." We conclude that the fact finders could reasonably determine that the May and June issues of "OM" were, in their entirety, statements disloyal to the United States.

We next consider the contention that the accused did not publish "OM" with the intent to promote disloyalty and disaffection among the troops.

As noted above, the pamphlets not only were a call for action, but suggested means by which the troops might actively demonstrate their own disloyalty and disaffection as, for example, by deserting to Canada, refusing promotions, or, indeed, themselves taking to the streets. Such statements permitted the court members to infer the requisite intent from the contents of the pamphlets and their free distribution to members of the armed services.

Finally, appellate defense counsel argue the absence of proof of " 'reasonably direct and palpable' prejudice to good order and discipline" from the accused's publications, as we required in United States v Gray, supra, at page 68. In that case, as appellate defense counsel point out, the statements were directly addressed to an audience not "inhospitable to discontent." Ibid. Here, they urge that no evidence exists of any audience being reached by the pamphlets. We do not so read the record.

According to tapes of radio interviews of the accused, duly introduced at the trial, the publication was mailed out on a nationwide basis. Copies of the May issue were distributed to members of the armed forces by a Mrs. Winifred Cockfield, who volunteered to assist the accused. The publication had a circulation of approximately 800 to 1,000 copies. Some copies were distributed to newsstands in the Pentagon and a Navy exchange. Others were unwittingly given to persons who requested them on behalf of an official investigating agency. Although the accused was acquitted of publishing and distributing an earlier issue of "OM" to which some of these distribution methods applied, we can reasonably conclude that the later dissemination of the May and June issues followed the same pattern. Indeed, each issue notes that it was free to military members, and the accused stated that his purpose was to educate them on his version of our national policy and what should be done about it.

From its beginning, this Court has construed Article 134, Uniform Code of Military Justice, 10 USC § 934, as requiring punishable conduct to be "palpably prejudicial to good order and discipline, and not merely prejudicial in an indirect and remote sense." United States v Snyder, 1 USCMA 423, 426, 4 CMR 15 (1952). See also United States v Gray, supra, and Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, pages 720–722. Application of the standard to publications and statements by military personnel is extraordinarily important because of our veneration of the free speech values that the First Amendment protects.

Although publicly made disloyal statements intended to promote disloyalty and disaffection among the persons in the armed forces are not per se protected by the First Amendment, see United States v Daniels, 19 USCMA 518, 42 CMR 120 (1970); United States v Harvey, supra; and United States v Gray, supra, comparable statements by civilians must amount to more than mere advocacy and be directed toward "inciting or producing imminent lawless action and . . . likely to . . . produce such action." Brandenburg v Ohio, 395 US 444, 447, 23 L Ed 2d 430, 89 S Ct 1827 (1969). First Amendment rights of civilians and members of the armed forces are not necessarily coextensive, but, in

**569**

speech cases, our national reluctance to inhibit free expression dictates that the connection between the statements or publications involved and their effect on military discipline be closely examined. As in other areas, the proper balance must be struck between the essential needs of the armed services and the right to speak out as a free American. Necessarily, we must be sensitive to protection of "the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate." United States v Schwimmer, 279 US 644, 654–655, 73 L Ed 889, 49 S Ct 448 (1929).

This Court has not fully delineated the limits on the right of free speech in the armed services. A relatively early opinion commented on the application of the right. United States v Voorhees, 4 USCMA 509, 16 CMR 83 (1954). We have declared that "Servicemen, like civilians, are entitled to the constitutional right of free speech." United States v Gray, supra, at page 66. But we have also noted that the right is not absolute in either the civilian or military community. United States v Daniels; United States v Harvey, both supra.

In the armed forces some restrictions exist for reasons that have no counterpart in the civilian community. Disrespectful and contemptuous speech, even advocacy of violent change, is tolerable in the civilian community, for it does not directly affect the capacity of the Government to discharge its responsibilities unless it both is directed to inciting imminent lawless action and is likely to produce such action. Brandenburg v Ohio, supra. In military life, however, other considerations must be weighed. The armed forces depend on a command structure that at times must commit men to combat, not only hazarding their lives but ultimately involving the security of the Nation itself. Speech that is protected in the civil population may nonetheless undermine the effectiveness of response to command. If it does, it is constitu-

**570**

tionally unprotected. United States v Gray, supra.

The real question presented is " 'the degree of danger which must exist before . . . [the accused's statements] may be punished.' " United States v Howe, 17 USCMA 165, 173, 37 CMR 429 (1967). While Brandenburg v Ohio, supra, apparently provides the current test for the civil community in forbidding the punishment of the mere advocacy of unconstitutional change, the danger resulting from an erosion of military morale and discipline is too great to require that discipline must already have been impaired before a prosecution for uttering statements can be sustained. As we have said before, the right of free speech in the armed services is not unlimited and must be brought into balance with the paramount consideration of providing an effective fighting force for the defense of our Country.

The proper standard for the governance of free speech in military law is still found, we believe, in Mr. Justice Holmes's historic assertion in Schenck v United States, 249 US 47, 52, 63 L Ed 470, 39 S Ct 247 (1919), that:

"... The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree."

Dennis v United States, 341 US 494, 510, 95 L Ed 1137, 71 S Ct 857 (1951), rephrased the standard in the language of Chief Judge Learned Hand that, " 'In each case (courts) must ask whether the gravity of the "evil," discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.' " Our inquiry, therefore, is whether the gravity of the effect of accused's publications on good order and discipline in the armed forces, discount-

ed by the improbability of their effectiveness on the audience he sought to reach, justifies his conviction.

Counsel for the accused point out that no evidence in this record proves that the accused's publications reached an audience "hospitable to discontent," United States v Gray, supra, or that they had any effect on any member of the armed services. Showing proximate connection between the accused's utterances and actual conduct on the part of one who may have been influenced by them to desert the naval service or otherwise to engage in unlawful conduct ordinarily would be impossible, but the actual success of his efforts is not important in the resolution of the issue. In Dennis v United States, supra, at page 510, the Supreme Court expressly rejected the concept that "success or probability of success is the criterion" by which punishment of forbidden speech is to be measured. It followed Mr. Justice Holmes's earlier declaration that, "If the act (speaking, or circulating a paper), its tendency and the intent with which it is done, are the same, we perceive no ground for saying that success alone warrants making the act a crime." Schenck v United States, supra, at page 52.

Dependable morale and discipline must be erected on something more substantial than fear of punishment or a conditioned reflex. The level of intelligence and education of members of the armed forces today is higher than ever before in our history. We have firm confidence that the motivation of the overwhelming majority is not so fragile that it could be shattered by the reading of the publications that are the subject of this case. But, despite the general intelligence and independence of thought that most military persons possess, not all of them have the maturity of judgment to resist propaganda. Not only World War II propaganda techniques but the success of some modern advertising methods tend to prove that statements often repeated become accepted as the truth, regardless of their inaccuracy.

One possible harm from the statements is the effect on others if the im-

pression becomes widespread that revolution, smashing the state, murdering policemen, and assassination of public officials are acceptable conduct. "We venture to believe that neither Hamilton nor Madison, nor any other competent person then or later, ever supposed that to make criminal the counseling of a murder . . . would be an unconstitutional interference with free speech." Frohwerk v United States, 249 US 204, 206, 63 L Ed 561, 39 S Ct 249 (1919). The hazardous aspect of license in this area is that the damage done may not be recognized until the battle has begun. At that point, it may be uncorrectable or irreversible.

For persons who compose the armed forces to have a good understanding of national issues is highly desirable. But the primary function of a military organization is to execute orders, not to debate the wisdom of decisions that the Constitution entrusts to the legislative and judicial branches of the Government and to the Commander in Chief.

For a member of the armed forces to encourage the kinds of action this accused did sharply conflicts with conventional concepts of good order and discipline. The papers in question were directed primarily to other members of the armed services. They expressly sought a breakdown in military discipline, called attention to methods by which those subject to military jurisdiction might safely flee from military control, heaped maledictions upon the United States, called into disrespect all military superiors and particularly those who had chosen the defense of the Country as their life's vocation, impliedly advocated assassination of the President and Vice President, and appealed to readers to take to the streets in violent revolution against the Government. The lack of success is not the criterion, for the Government is entitled to protect itself in advance against a calculated call for revolution. Dennis v United States, supra.

This case is not one of a political

discussion between members of the armed forces in the privacy of their rooms or at an enlisted men's or officers' club. These were purposefully written papers calling for violent and revoluntionary action. We conclude that the court members were justified in finding that their publication and distribution tended palpably and directly to affect military order and discipline and were punishable under the general article.

## III

The second issue before us is whether the military judge denied the appellant due process of law by excluding evidence on whether the publications were in fact disloyal and whether the accused's conduct was prejudicial to good order and discipline.

At the trial, the accused offered testimony from former Senator Ernest Gruening, General David M. Shoup, Rear Admiral Arnold E. True, Professor Vern Countryman, and Professor Richard A. Falk to show their opposition to the Vietnam war and to demonstrate historically that views similar to those espoused by the accused had been violently and intemperately expressed by individuals whose loyalty to the United States was well established.

The testimony of Lieutenant Allan Black was also proffered to establish that various publications commercially available in Navy exchanges advocated substantially the same measures as were set forth in "OM." According to appellate defense counsel, the availability of these publications established that these views were not considered disloyal by naval authorities and, since their distribution was sanctioned, the views ex- pressed in them and in the accused's publication, could not be considered as prejudicial to good order and discipline.

The military judge excluded all testimony of this nature, and, we believe, correctly so.

No basis in law or fact exists for the conclusion that commercial availability of publications on Navy exchange newsstands constitutes a sanction by military authorities of their contents. See Iva Ikuko Toguri D'Aquino v United States, 192 F2d 338 (CA 9th Cir) (1951). Indeed, the record indicates that these items are stocked and restocked by a news company, with the exchange being billed for them.

Moreover, that other writers and speakers have advocated measures similar to those espoused by the accused does not tend to establish the loyalty of those statements. The question of disloyalty is not to be found in the identification of the declarant but in the content of the declaration. That others have said similar things does not establish anything more than that they, too, may be in violation of the law.[1] Compare United States v Miles, 11 USCMA 622, 29 CMR 438 (1960).

The applicable principle was set forth in United States v Pelley, 132 F2d 170 (CA 7th Cir) (1942), at page 181:

"It is argued in this case, as in similar cases, that defendants should not have been convicted, because others have expressed, in newspapers, pamphlets, and in oral

---

[1] Fairness to the witnesses presented, as distinguished from the publications offered, requires that we state their testimony, proffered in Article 39 (a) sessions, does not indicate that they in any way urged the action Priest urged. Both General Shoup and Senator Gruening testified to their opposition to the Vietnam war, but neither in any way suggested other than constitutional means to implement their views. Indeed, General Shoup testified that his views, as set forth in "OM," were quoted out of context and, inferentially, given a different meaning.

statements, some of the words and ideas apearing in the . . . [publications], and used as the basis of this indictment. It is sufficient to say that we are considering this case only. Whether others have been guilty of like violations, affords no legal excuse for the defendants."

The decision of the United States Navy Court of Military Review is affirmed.

Judges QUINN and DUNCAN concur.