# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MULLIGAN, FEBBO, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Staff Sergeant WILLIAM L. MITCHAM**
**United States Army, Appellant**

ARMY 20140969

Headquarters, Joint Readiness Training Center and Fort Polk
Randall L. Fluke, Military Judge (arraignment)
Wade N. Faulkner, Military Judge (trial)
Colonel Jan E. Aldykiewicz, Staff Judge Advocate

For Appellant: Captain Jennifer K. Beerman, JA; Mr. Sean A. Marvin, Esquire (on brief); Captain Matthew L. Jalandoni, JA; Mr. Sean A. Marvin, Esquire (on reply brief).

For Appellee: Colonel Mark H. Sydenham, JA; Major Cormac M. Smith, JA; Captain Linda Chavez, JA (on brief).

30 November 2016

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

WOLFE, Judge:

On appeal from his general court-martial convictions, appellant asked this court to address three allegations of error. We discuss two, but only find one to be worthy of relief.[1] Specifically, we set aside appellant's conviction for indecent

----

[1] We do not address in depth appellant's contention that the trial counsel's comments during trial and during argument amounted to prosecutorial misconduct. These comments included the trial counsel's rebuttal argument where he referred to each defense argument as trying to pull "rabbits out of a hat" while showing a power point presentation with a cartoon bunny with blood dripping from a bullet hole in the bunny's head as he addressed each defense argument. The comments identified by

(continued . . . )

language as we hold that while appellant's statement was offensive, it was not "indecent." We affirm the lesser-included offense of a general disorder under Article 134, UCMJ.

A general court-martial arraigned appellant on six specifications alleging violations of the UCMJ. Two specifications alleged appellant had stolen and mistreated a dog belonging to Ms. KC. Two specifications alleged he battered and strangled Ms. KC. One specification alleged appellant had used indecent language during unit training. The final specification alleged appellant was disrespectful to his commander when he was being counseled for his indecent statement. Appellant pled not guilty to all offenses.

A panel with enlisted representation acquitted appellant of stealing and mistreating Ms. KC's dog. The panel convicted appellant of disrespecting a superior commissioned officer, assault consummated by battery, aggravated assault with force likely to produce death or grievous bodily harm, and communicating indecent language in violation of Articles 89, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 889, 928, 934 (2012) [hereinafter UCMJ]. The convening authority approved the adjudged sentence of a dishonorable discharge, confinement for two years, and reduction to the grade of E-1.

## BACKGROUND

### A. *Indecent Statement and Disrespect*

On 16 October 2013, appellant attended unit training. During one of the sessions, the presenter displayed a photograph of three individuals and asked "which of these individuals poses the greatest security threat to our forces?" One of three individuals was a woman. Appellant responded that he did not trust the woman, and explained, in a clear reference to women's menstrual cycles, "I don't trust anything that bleeds for seven days and doesn't die."[2] On direct-examination at his court-

---

(. . . continued)

appellant generally fall into two categories: Those appellant did not object to, and those the military judge corrected (either sua sponte or after a defense objection). As to the former, the claims of error were unpreserved, forfeited, and did not amount to plain error. As to the latter, we find the military judge's warnings to the trial counsel adequately addressed the issue in the absence of either a specific objection or request for a curative instruction by appellant. The issues raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982) are without merit.

[2] The statement appears to be a quote from the movie SOUTHPARK, BIGGER, LONGER AND UNCUT (Comedy Central Films 1999).

martial, appellant testified he was bored in the class and was "just trying to get a rise" and it was said in a "joking way." He also testified on direct-examination that "I didn't see where it was wrong. I mean, understanding making comments [sic] like that in the real world today and the way the military is, yes, it was wrong. But, you know . . ." (ellipses in original).

On cross-examination, appellant twice testified that he "wasn't trying to be funny" when he made the comment.

Lieutenant Colonel (LTC) Cho was appellant's task force commander and also attended the training. Hearing appellant's statement, LTC Cho immediately held a meeting with the senior leaders in the task force to brief them on the inappropriateness of the statement and to ensure everyone understood appellant's comment was unacceptable. Lieutenant Colonel Cho ordered appellant's company commander to counsel appellant on the statement.

The next day, on 17 October 2013, Captain (CPT) Chase held a formal counseling session with appellant. The counselling statement included the use of Dep't of Army, Form 4856, Developmental Counseling Form [hereinafter DA Form 4856]. Appellant described, on direct-examination, his feelings about the counseling session as follows:

> I had mixed emotions and feelings from the get go. I mean, I was getting ready to be counseled for something that I didn't believe that I had done anything wrong because, to me, if I had done wrong, they should have come and told me at the moment. . . . So, I figured it was some kind of political stuff that somebody wanted to have done.

Appellant refused to sign the counseling form, saying to his commander "Fuck this shit, I'm not going to sign this."[3]

### B. Battery and Aggravated Assault

During the summer of 2013, appellant and Ms. KC were romantically involved. In July, she moved in with appellant to help him recover from back surgery. On 13 August 2013, after a long night out, appellant and Ms. KC returned home in the early morning hours. Ms. KC and appellant both testified, but gave differing stories as to what happened that morning.

---

[3] A signature on the form does not indicate agreement. The person being counseled may indicate they "agree" or "disagree with the information" that formed the bases of the counseling. *See* DA Form 4856.

3

Ms. KC testified they went to the race track, where they both drank alcohol. She estimated she had about six beers during a three-hour period. As they were leaving, they made friends with an older couple, who invited them to their house to drink and hang out. Over her protestations that she was tired, appellant accepted the invitation. Once at the house, they sang karaoke and appellant began to drink liquor. Ms. KC stated appellant "gets a little bit more mouthy when he drinks liquor." At one point, when they were separated from appellant, the female host told Ms. KC to get out of the relationship, warning her: "Baby, get out now." Ms. KC testified appellant decided he was ready to go "because he wanted me to make him breakfast." She replied she wanted to go to bed, and did not want to cook. Appellant then told their hosts he was having a problem with his "old lady," and he needed to "take care of it."

Upon returning home, Ms. KC got into her pajamas and went to bed. She testified that appellant wanted her to make him breakfast and dragged her out of bed by her feet toward the kitchen. She then explained the violence escalated. Appellant slammed her into a wall and eventually began to strangle her with both hands around her neck.[4] She testified that she continued to fight him and eventually broke free and ran out the front door. As she ran through the yard, she was tackled by appellant, who again strangled her. She again escaped, and ran to the neighbor's house. She testified that she told the neighbor appellant was trying to kill her. The neighbor called the police. Ms. KC was taken to the hospital.

Appellant testified after returning home, Ms. KC changed, but it was she who had insisted on cooking breakfast. He stated the argument began when he tried to convince her not to cook eggs and bacon, but she continued to insist that "I'm cooking. We're hungry. I'm going to cook." In a nearly unbroken narrative running several pages, appellant described his versions of events:

> Q: What happened?
>
> A: She takes the pans back. I take them back out of her hands. I said, "Stop. You're getting unruly, and this is ridiculous. Stop, [K]." Put the pans back up, and whenever I stood back up, she was in my face, telling me I'm not the boss of her, I don't control her, I don't do this, I don't do that, she'll cook if she damn well wants to, she'll do anything in the world she wants to. And, nothing I do or say is going to stop, so get out of her way. I said, "[K], please get out of my face." I mean she's chewing the end of my nose off"

---

[4] The panel discredited her testimony about being slammed into the wall and excepted this language from the assault consummated by battery specification.

Q: Mm-hmm.

A: "Get out of my face." When I got her away from me, she jumps and flies hot. She scratches, beats, hits. And, I took enough of it. I grabbed her on her arms. I walked her back into the - - across from my kitchen, into the living room, where the couch sat in front of my bay window. I laid her down on the couch, kind of with her back and her head on the sofa of the couch, where the pillow - - the back pillow of the couch. I laid her down, and she was just constantly slapping and hitting and scratching and kicking and doing everything she could. And, all I was doing was trying to calm her down. I said, "[K], you've got to stop this." I said "There's no sense in any of this." I secured her hands, finally to keep her from hitting me. I take her arms, and I'm sitting on her stomach with my rear end's on her stomach just holding her down. I put her arms under my knees, and I hold her. I got her pinned. I say, "Stop," and I put my left hand over her mouth. I say, "[K], stop. This is getting ridiculous. You're acting crazy for no reason. I don't understand why you're doing this, or what's going on. Please stop." She's trying to scream a little bit. And I said, "Look, this is just going nowhere. We're going to both wind up in trouble if you keep going like this." I said, "Somebody's going to wake up, hear you screaming, and call the police. This is all I need in my career. And, I know you definitely don't need this. So, just stop please."

I looked at her, and I said, "Are you going to stop?" She shook her head yes. . . . I said "Okay. I'm going to get up and off of you." She remained quiet when I took my hand off of her mouth. I backed up and out of the way. She stood up and went straight for the front door. I stood there and watched her stumbling. Opening the door, trying to get it unlocked. . . . And, I just followed along behind her. And, upon getting there, I seen that she was going to commit to run on into a driveway that conjoins with a busy highway and I didn't want her to be drunk running around. So, I placed my hand on her right shoulder. As soon as my hand hit her shoulder, her feet fell out from under her. She gets on her back, and puts her fists up and her feet up, like you're going to hurt me get away from me, I'm going to fight you. And, I'm

5

looking. I'm like, "What are you doing, [K]? Why are you like this?" So, I walk up to her, and I knelt down beside her. And, I take my hand, and I place it on her. And I say, "Please stop, [K]. Just get up. Let's go inside and relax." I said, "You're going to wake the neighbors up." This is on a Sunday morning. People's [sic] probably getting ready to go to early church services, mass, whatever. I said "Please, just get up and go inside and relax."

"I'm not doing anything. He's trying to kill me. You're going to kill me. You're going to hurt me. Blah blah blah blah." I said, "Okay, then how about this? You've pissed me off. Fuck you. Get up. Get away from me."

[. . .]

So, after I told her, "You know, you need to come get your stuff. Give me a few minutes to get it all together for you, and you can leave."

[. . .]

And, I back off of her. I turn around. And, I walk inside my house. Close the front door and I lock it behind me. I don't want to deal with any of it.

Appellant offered no credible explanation for the injuries to Ms. KC's neck and throat. The cross-examination of appellant did not add to the credibility of appellant's version of events on direct-examination.[5] Testimony from the neighbor,

---

[5] In determining the findings are correct in fact, we likewise credit Ms. KC's version of events. In *United States v. Pleasant*, 71 M.J. 709, 713 (Army Ct. Crim. App. 2012) we stated an accused "testifies at his own peril" and adopted the logic of the 11th Circuit: "Most important, a statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt. By 'substantive' we mean evidence adduced for the purpose of proving a fact in issue as opposed to evidence given for the purpose of discrediting a witness (i.e., showing that he is unworthy of belief), or of corroborating his testimony. . . . when a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true." *United States v. Williams*, 390 F.3d. 1319, 1325 (11th Cir. 2004) (internal quotations and citations omitted). In other words, an accused's testimony that the light was red, if incredulous, can be considered as positive evidence the light was in fact green.

responding police, and emergency room personnel substantially confirmed Ms. KC's story. Each witnesses testified Ms. KC had significant bruising on her neck. One doctor testified it was the worst case of strangulation he had seen that had not resulted in death. The neighbors testified that Ms. KC banged on their door, fell into the house when they opened the door and franticly asked for help because appellant was "trying to kill [her]." A police officer testified that appellant was agitated, and had scratches on his face, but otherwise appeared uninjured.

The panel members apparently credited Ms. KC's version of events and convicted appellant of assault consummated by battery and aggravated assault.

## LAW AND DISCUSSION

### A. Indecent Language

Appellant argues his conviction for communicating indecent language is legally and factually insufficient. We agree the specification is factually insufficient and therefore do not address the legal sufficiency of the specification. However, we find appellant's statement—though not indecent—was offensive, grossly inappropriate, and certainly tended to bring discredit upon the Army. Accordingly, we approve a finding of guilty to a general disorder as a lesser-included offense.

### 1. Was the Statement Indecent?

The President has defined indecent language as follows:

> "Indecent" language is that which is grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought. Language is indecent if it tends reasonably to corrupt morals or incite libidinous thoughts. The language must violate community standards.

*Manual for Courts-Martial, United States* (2012 ed.) [hereinafter *MCM*], pt. IV, ¶ 89.c.

Not every *offensive* comment rises to the level of being "*indecent*." At least based on the record before us, we do not find appellant's comment that related menstrual cycles to trustworthiness was "indecent." Appellant's offensive statement did not incite lust or vulgar thoughts. Discussion of menstrual cycles are not "filthy" or "disgusting." Rather, appellant's comment was simply, if blatantly, sexist. The offensiveness of appellant's comment was not due to its "indecent"

7

nature, but rather because it equated untrustworthiness with an immutable trait of womanhood and relegated all women to a state of inferiority as compared to men.

Confronted with a highly offensive statement, there is pull towards equating "offensive" statements with "indecent" statements. That pull may be stronger given appellant testified he saw nothing wrong with his statement. However, in determining whether appellant's statement was indecent, we must set aside the statement's offensive nature and look to whether the government proved beyond a reasonable doubt the statement was "indecent" as that term is defined. We find the government has not met its burden.

Accordingly, we will except out from the specification the word "indecent." With the word "indecent" stricken, the specification alleges a general disorder: appellant made a statement, and the statement was prejudicial to good order and discipline and was service discrediting.

### 2. *First Amendment*

Before affirming the lesser-included offense of a general disorder, we discuss the First Amendment implications of this lesser-included offense. The question, broadly stated, is to what extent are statements that are prejudicial to good order and discipline or service discrediting (i.e. the statement satisfies each element of Article 134) nonetheless prohibited from criminal sanction by the First Amendment?

Our superior court dealt with this issue extensively in *United States v. Priest*, a case that involved the prosecution, under Article 134, UCMJ, of disloyal statements:

> From its beginning, this Court has construed Article 134, [UCMJ], as requiring punishable conduct to be palpably prejudicial to good order and discipline, and not merely prejudicial in an indirect and remote sense. Application of the standard to publications and statements by military personnel is extraordinarily important because of our veneration of the free speech values that the First Amendment protects.
>
> [. . .]
>
> First Amendment rights of civilians and members of the armed forces are not necessarily coextensive. . . . This Court has not fully delineated the limits on the right of free speech in the armed services. . . . Servicemen, like civilians, are entitled to the constitutional right of free

> speech. But we have also noted that the right is not absolute in either the civilian or military community. In the armed forces some restrictions exist for reasons that have no counterpart in the civilian community. Disrespectful and contemptuous speech, even advocacy of violent change, is tolerable in the civilian community, for it does not directly affect the capacity of the Government to discharge its responsibilities unless it both is directed to inciting imminent lawless action and is likely to produce such action. In military life, however, other considerations must be weighed. The armed forces depend on a command structure that at times must commit men [and women] to combat, not only hazardous to their lives but ultimately involving the security of the Nation itself. Speech that is protected in the civil population may nonetheless undermine the effectiveness of response to command. If it does, it is constitutionally unprotected.

21 U.S.C.M.A. 564, 569-70, 45 C.M.R. 338, 343-44 (1972) (internal quotations and citations omitted). While not a recent case, the framework suggested by *Priest* was recently affirmed in *United States v. Rapert*:

> Even assuming arguendo that Appellant's speech was within the ambit of the First Amendment's embrace, the unique nature of Article 134, UCMJ, and the interests it seeks to protect justify the proscription of Appellant's speech in this case. First, contrary to Appellant's assertions, the Government proved a palpable connection between his speech and the military mission or environment. Second, the balance of interests in this case weighs heavily in favor of proscription.

75 M.J. 164, 171 (C.A.A.F. 2016)

Here, we find appellant's conduct to be constitutionally unprotected. Appellant's statement, which equated a women's menstrual cycle with untrustworthiness, was both prejudicial to good order and discipline and service discrediting. The government introduced evidence to prove these elements and did not merely assume that proof could be inferred. Appellant did not make the statement in a private or personal capacity, but instead at a mandatory training event. Finally, we note the pernicious effects of appellant's statement on unit cohesion and accomplishment of the mission. Appellant's statement was no woman could be trusted. In weighing appellant's comment we must consider "the paramount consideration of providing an effective fighting force for the defense of

our country" and determine whether the danger presented by appellant's comments "will bring about the substantive evils that Congress has a right to prevent." *Priest*, 21 C.M.A. at 570. Appellant's statement falls outside this constitutional protection.

At trial, appellant argued in a training environment one should not be punished for speaking one's mind. In this case, however, that argument is unpersuasive. Appellant's initial testimony on direct-examination was that his statement was made because he was bored and wanted to get a "rise" out of people. He has no plausible training purpose to his statement.

Appellant also argued at trial, in the combat arms, vulgarity and coarseness are common and his statement was made in jest. Perhaps all true. Certainly, it may be unwise to expect priestly behavior of those charged with executing violence on behalf of the nation. The UCMJ does not criminalize the making of every rude or inappropriate joke. Nor, certainly, is it wise or appropriate to charge such conduct every time it may be legally permissible to do so. It is also likely that in most cases the appropriate government response is the path initially taken here: counseling. (a path that appellant may have altered when he responded to the counseling by saying "fuck this shit" to his commander). In any event, these concerns are likely beyond the scope of our appellate review. Our review is limited to determining whether the specification was correct in law and fact and should be approved. UCMJ art. 66(c). Whether an offense *should* be pursued as a matter of prosecutorial discretion is outside the scope of our review. *See United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

### B. Ineffective Assistance of Counsel

Appellant's second assignment of error argues his counsel was ineffective during trial for failing to seek exculpatory evidence, for failing to call witnesses, for making arguments that implied guilt and materially harmed appellant's credibility, and for failing to object to trial counsel's argument. Both appellant and his counsel submitted affidavits for us to consider on appeal.

As our superior court explained in *United States v. Datavs*:

> To establish ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice. In reviewing for ineffectiveness, the Court looks at the questions of deficient performance and prejudice de novo.

> With respect to [the] first prong, courts must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. As to the second prong, a challenger must demonstrate a reasonable probability that, but for counsel's deficient performance the result of the proceeding would have been different.

71 M.J. 420, 424 (C.A.A.F. 2012) (citations and internal quotation marks omitted); *see Strickland v. Washington*, 466 U.S. 668 (1984). We do not find appellant has met his burden.

First, appellant alleges his counsel failed to exercise due diligence to find a color photograph of his mug shot that appellant claimed would show injuries. After reviewing the counsel's affidavit, which is in accord with the motions practice in the record of trial, we find counsel's efforts were reasonable. Additionally, appellant has not provided us with the color photo so it is unclear that *any* effort by his counsel would have located the photo. Finally, without the photo we cannot find appellant has met his burden of establishing prejudice.

Second, appellant claims his counsel did not call certain witnesses who would have aided in his defense. Appellant does not provide an affidavit from either alleged witnesses as to how they would have testified. Rather, it is appellant who avers to what they would have said. We find appellant has failed to meet his burden of proof. *See United States v. Cade*, ARMY 20140325, 2016 CCA LEXIS 636 (Army Ct. Crim. App. 2016) (requiring affidavits from someone with personal knowledge). Moreover, even looking into the affidavits, appellant's counsel provided sound tactical reasons for not calling each witness. Counsel avers, for example, that one witness, appellant's neighbor, had a prior conviction for rape, had memory problems stemming from an accident, and offered to "say whatever was necessary" to help appellant.

Third, appellant argues his counsel's arguments and trial strategy ended up harming appellant's credibility when he testified. In short, appellant's counsel argued and presented evidence in support of a theory appellant and Ms. KC were engaged in a mutual drunken affray. Counsel intended to introduce evidence, consistent with Ms. KC's testimony, that both Ms. KC and appellant drank to excess and engaged in a mutual affray, and therefore undermine the aggravated assault specification—the most serious charge. *See MCM*, pt. IV, ¶ 54.c(2)(d). Appellant, however, testified that he was sober, was entirely reasonable throughout, and was acting only in self-defense. The record shows that counsel's attempts to guide appellant through his testimony were at times frustrated by appellant's testimonial enthusiasm.

We agree defense's counsel's theory of the case did not entirely square with appellant's testimony.  However, what is not clear on appeal (as both counsel and appellant fail to address it in their respective affidavits), is to what extent the defense trial plan centered on appellant testifying in his own defense.  That is, what is a reasonable trial strategy if the accused is not planning on testifying may be unreasonable in light of his expected testimony.  Of course, whether an accused testifies is ultimately appellant's decision alone.  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  Accordingly, appellant has not rebutted the strong presumption that his counsel's performance was reasonable.[6]

As to the remaining alleged errors, we hold appellant has failed to demonstrate prejudice.  Appellant must prove prejudice.  *Strickland* at 693.  Here, on appeal, appellant argues that "[h]ad counsel been effective, the result might have been different."  The evidence against appellant was substantial.  The government introduced evidence from multiple sources of bruising and injury to Ms. KC's neck, which was inconsistent with appellant's version of events that he acted in self-defense.  Appellant's speculation on appeal that in the brief moments before Ms. KC fled to the neighbor's house, she had intentionally injured herself is entirely without support.  Lastly, appellant's testimony was simply incredulous.

## CONCLUSION

Having completed our review and in consideration of the entire record, we AFFIRM only so much of Specification 2 of Charge III as finds:

> In that [Appellant], U.S. Army, did, at or near Fort Polk, Louisiana, on or about 16 October 2013, orally communicate to a classroom full of Soldiers after SHARP training, certain language, to wit: "I don't trust anything that bleeds for seven days and doesn't die," or words to that effect, such conduct being of a nature to the prejudice of good order and discipline in the armed forces and of a nature to bring discredit upon the armed forces.

The remaining findings of guilty are AFFIRMED.  We are able to reassess the sentence on the basis of the error noted and do so after conducting a thorough analysis of the totality of circumstances presented by appellant's case and in accordance with the principles articulated by our superior court in *United States v.*

---

[6] We also note appellant was charged with aggravated assault.  Self-defense is not a defense to aggravated assault when appellant was faced only with a simple battery.  *See* Rule for Courts-Martial 916(e)(1).  Put differently, appellant's view of the evidence on appeal would have left little defense against the most serious charge he faced.

MITCHAM—ARMY 20140969

*Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013) and *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986). We are confident that based on the entire record and appellant's course of conduct, the panel would have imposed a sentence of at least that which was adjudged, and accordingly we AFFIRM the sentence.

We find this reassessed sentence is not only purged of any error but is also appropriate. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings set aside by our decision, are ordered restored.

Senior Judge MULLIGAN and Judge FEBBO concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

13