**UNITED STATES, Appellee,**

v.

**Sergeant First Class David W. STONE,
306–58–7573, United States Army,
Appellant.**

**ACMR 9101341.**

U.S. Army Court of Military Review.

30 April 1993.

For Appellant: Captain Robert L. Carey, JAGC (argued); Captain Robin N. Swope, JAGC (on brief).

For Appellee: Captain Robert J. Walters, JAGC (argued); Colonel Dayton M. Cramer, JAGC, Lieutenant Colonel Joseph A. Russelburg, JAGC, Major Joseph C. Swetnam, JAGC (on brief).

Before JOHNSON, WERNER and GRAVELLE, Appellate Military Judges.

## OPINION OF THE COURT ON RECONSIDERATION

GRAVELLE, Judge:

Contrary to his pleas, the appellant was found guilty by a military judge sitting as a general court-martial of two specifications of carnal knowledge, of "willfully and wrongfully [giving] a speech" before a high school assembly in which he gave "a false account of his actions in Iraq during Operation Desert Shield/Desert Storm," and of wrongfully wearing as part of his uniform the green beret of a Special Forces soldier. The carnal knowledge offenses were charged as violations of Article 120 and the remaining offenses were charged as violations of Article 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 934 (1982) [hereinafter UCMJ]. The convening authority approved the adjudged sentence of a dishonorable discharge, confinement for eighteen months, forfeiture of all pay and allowances, and reduction to Private E1.

This court affirmed the appellant's conviction in an opinion dated 25 February 1993. On 17 March 1993, appellate defense counsel petitioned this court to reconsider its decision, but only as to those issues pertaining to the revocation of waiver of the Article 32, UCMJ, investigation. In addition, after specifically disclaiming ineffective assistance of the trial defense counsel in the original pleadings, the appellant now asks us to consider a supplemental assignment of error asserting that the trial defense counsel was ineffective in that "he failed to preserve SFC Stone's right to an Article 32 investigation of the original charges." By order dated 2 April 1993, we vacated our opinion of 25 February 1993, granted the appellant's petition for reconsideration, and granted the appellant's petition to file the supplemental assignment of error. Our reconsideration is limited to Part II of this opinion, which part incorporates our decision upon reconsideration and our finding regarding the supplemental assignment of error.

In the original pleadings, there were four assignments of error raised by the appellant by written brief and elaborated upon in oral argument presented to this court.[1]

---

1. At the invitation of the Professor of Law, United States Military Academy, and without objection of the parties, the Court heard oral argument in this case at West Point, New York, on

Those four asserted errors were: (1) That the evidence is insufficient to support a conviction for giving a service-discrediting "false speech;" (2) That the appellant's case was improperly referred to a general court-martial without a pretrial investigation pursuant to Article 32, UCMJ [hereinafter Article 32 investigation]; (3) That the military judge erred in failing to order a pretrial investigation when the issue was raised with him; and, (4) That the trial counsel improperly withheld information that had been specifically requested during the discovery process. In addition, this court specified an issue regarding the admissibility of a report of investigation as aggravation evidence on sentencing. With regard to the first three issues raised by the appellant and the specified issue, we found no error. Concerning issue four, we found error but also found no corrective action was required. Having now reconsidered the issues pertaining to the Article 32 investigation, we adhere to our previous decision. We also find no merit in the appellant's supplemental assignment of error regarding ineffective assistance of counsel.

### I. Sufficiency of the "False Speech" Offense

#### A. *Facts*

The appellant deployed to Saudi Arabia with the G–3 section (Operations) of the 101st Airborne Division (Air Assault) as part of Operation Desert Shield. About the time the air war began in January 1991, the appellant returned to the United States on emergency leave because his mother was seriously ill. He never returned to Saudi Arabia.

■ While he was home in Vincennes, Indiana, the principal of his high school alma mater invited the appellant to describe his experiences in the desert to the students at the school. On 5 February 1991, almost three weeks prior to the commencement of the ground war,[2] the appellant appeared at the high school in his Army uniform and wearing a green beret. He addressed two student assemblies on that date. During the course of the student assemblies, the appellant falsely described his activities in Southwest Asia. He told of parachuting from 50,000 feet into Baghdad as leader of a four-man Special Forces team in the hours prior to commencement of the air war in mid-January 1991. Included in his story was the false statement that he had also been in Iraq in December, 1990, *prior to* the outbreak of hostilities. The appellant also told the students that they may be in jeopardy because terrorists intent on retaliation may be watching his activities.

Unfortunately for the appellant, a reporter for the local newspaper was present, took notes, and recounted the appellant's story in the newspaper two days later.[3]

---

28 October 1992. Approximately 500 cadets and members of the staff and faculty, along with active duty and reserve judge advocates from the New York–New Jersey area, attended the oral arguments.

2. We judicially note that the ground war commenced on 24 February 1991, nineteen days after the high school assemblies.

3. The newspaper story appeared on the front page of the *Vincennes Sun–Commercial* on 6 February 1991, and included a photograph of the appellant addressing one of the school assemblies. The story, written by Edward L. Sebring, accurately reported the appellant's comments according to numerous witnesses who were present at the school assemblies. The newspaper reported, *inter alia,* that:

Stone said his first mission into Iraq was on Dec. 28.

About 8:30 p.m. on Jan. 16, Stone was leading one of 20 four-man Green Beret teams into Baghdad. The teams were dropped by parachute from 50,000 feet. The drop of nearly 10 miles takes more than four minutes to complete, he said.

As a team leader, Stone said he wears a computerized "glove" valued at $1.2 million. The device ties into "Star Wars" satellites and can pinpoint his geographic location within 20 feet, as well as direct him to the helicopter pickup point and warn of approaching enemies, he said.

Their first target was power plants, Stone said. Then, in the darkness the American troops donned their night vision goggles and took on the Republican Guards while they either blew up or placed electronic homing devices on various military targets for bombers to target a few hours later.

Because the goggles are heat sensitive, bullets leave a visible heat trail in the air, Stone said, and they were "flying everywhere."

Even more unfortunate for the appellant, the newspaper publisher, who was the younger brother of then-Vice President Dan Quayle, telefaxed his older brother a copy of the story, proudly pointing out the exploits of a local hero. Vice President Quayle's office sent a copy of the newspaper story to Army officials in the Pentagon. Inquiries revealed that the appellant was not assigned or trained as a Special Forces soldier and that the story was completely fabricated.

Immediately after the story was published, the Vincennes newspaper forwarded a copy of the story to the Associated Press. The Associated Press responded with interest and with a request for additional information concerning the appellant's alleged activities in Iraq prior to the outbreak of the air war. When the newspaper reporter contacted the appellant with these questions, the appellant expressed some concern about the story and asked that the story not be further circulated. The appellant never retracted the story or indicated that it was false; however, as a result of the appellant's request, the editor recalled the story from the Associated Press.

At trial, the appellant did not dispute that he had misrepresented his combat service during Operation Desert Shield/Storm. The government presented evidence that students and others who heard the presentations had a lessened confidence in the integrity of the Army, once the falsity of the appellant's story became known. The government also presented evidence of some concern about the story among special operations personnel at the time the story was published. Some believed that the story, although completely false, publicized a sensitive operational subject and could cause casualties among special operations personnel during the impending ground war. The government further introduced evidence that once the falsity of the story was confirmed, a Special Forces public affairs officer (presumably on behalf of the Army) apologized to the high school principal for the incident and suggested ways to overcome the anxiety caused by the appellant's comments about possible terrorist activity at the school.

Following the presentation of evidence on the merits, the military judge convicted the appellant, *inter alia*, of making an unauthorized speech, specifically excepting the words "[t]o the prejudice of good order and discipline in the Armed forces." He thereby found the appellant guilty only of service-discrediting conduct.

### B. *Discussion*

In determining the sufficiency of the "false speech" specification, we must decide: (1) If Sergeant Stone's conduct in giving a "false speech" may be the basis for prosecution and conviction under Article 134, UCMJ; and, (2) If the evidence is sufficient in this case to show that his conduct was service-discrediting.

We hold that the appellant's conduct was conduct which may be proscribed by Article 134, UCMJ, and that the evidence was sufficient to show that the conduct was service-discrediting.

### 1.

■ At the outset, appellate defense counsel asserts that the appellant's presentations were "unofficial" and therefore could not be "service-discrediting." We do not agree that the appellant's speeches were "unofficial" because he was on leave and supposedly speaking only for himself. We find that when the appellant, a senior noncommissioned officer, made presentations regarding military activities while in uniform in a public forum, he was acting in an official capacity.

Next, we must determine if the specialized needs of military society can criminalize activity similar to that with which the appellant was charged and convicted.

Article 134, UCMJ, an article which has its antecedents in the American Articles of War of 1776, and in the British Articles of War before that, originally punished only conduct which was "to the prejudice of good order and discipline." *Parker v. Levy*, 417 U.S. 733, 745–48, 94 S.Ct. 2547, 2556–58, 41 L.Ed.2d 439 (1974). In a revision in 1916, the Congress added a clause also punishing "all conduct of a nature to bring discredit upon the military service."

*Id.* at 746, 94 S.Ct. at 2557, citing Act of Aug. 29, 1916, c. 418, 39 Stat. 619, 666.

Article 134, UCMJ, does not make "every irregular, mischievous, or improper act a court-martial offense." *United States v. Sadinsky,* 14 U.S.C.M.A. 563, 34 C.M.R. 343, 345 (1964) (quoted in *Levy,* 417 U.S. at 753, 94 S.Ct. at 2560). While it found that Article 134, UCMJ, of itself was not unconstitutionally overbroad, the Supreme Court recognized that "[T]here may lurk at the fringes of [Article 134], even in the light of [its] narrowing construction by the United States Court of Military Appeals" some conduct that would be protected by the First Amendment. *Levy,* 417 U.S. at 760–61, 94 S.Ct. at 2564.

■ Even though *Parker v. Levy* involved offenses charged only as conduct to the prejudice of good order and discipline under Article 134, and the case before us involves a conviction for only service-discrediting conduct, the general principles discussed in *Parker v. Levy* are instructive. In *Parker v. Levy,* the Supreme Court recognized that "the military is, by necessity, a specialized society separate from civilian society." *Id.* at 743, 94 S.Ct. at 2555. The Court also recognized a "customary military law." *Id.* at 744, 748–49, 94 S.Ct. at 2556, 2558. Under this specialized military law, the Supreme Court recognized that the military can regulate "a much larger segment of the activities of the more tightly knit military community." *Id.* at 749–50, 94 S.Ct. at 2558–59. Within that power to regulate is the power to impose criminal sanctions for activities that do not conform with lawful regulation.

The present instrument of punitive regulation of soldiers' conduct is the Uniform Code of Military Justice. This uniform code includes, *inter alia,* punitive sanctions for offenses which are also crimes in civilian society such as murder, rape, robbery, assault, and larceny. However, the UCMJ cannot be equated to a civilian criminal code because it also proscribes crimes which are uniquely military in nature, such

as unauthorized absences, disrespect to superior commissioned and noncommissioned officers, and disobedience to orders. *See generally* Articles 78 through 134, UCMJ, 10 U.S.C. §§ 878 through 934. In short, the UCMJ also "regulates aspects of the conduct of members of the military which in the civilian sphere are left unregulated." *Levy,* 417 U.S. at 749, 94 S.Ct. at 2558. Article 134, under which the appellant was prosecuted, is a primary means within the Uniform Code of Military Justice of regulating servicemembers' conduct. Finally, "[a]n accused must be on notice that his conduct is unlawful and that [Article 134] fairly informs 'that the particular conduct which he engaged in was punishable.'" *United States v. Guerrero,* 33 M.J. 295, 297 (C.M.A.1991), quoting *Levy,* 417 U.S. at 755, 94 S.Ct. at 2561.

The ability to regulate a servicemember's expressive conduct has been subjected to much judicial scrutiny. The "free speech" cases decided by the Supreme Court and the military appellate courts clearly permit criminal sanctions for *disloyal* statements. *See, e.g., Levy,* 417 U.S. 733, 94 S.Ct. at 2550; *United States v. Priest,* 21 U.S.C.M.A. 564, 45 C.M.R. 338 (1972); *United States v. Gray,* 20 U.S.C.M.A. 63, 42 C.M.R. 255 (1970); *United States v. Bell,* 40 C.M.R. 807 (A.C.M.R.1969). *See also United States v. Wilson,* 33 M.J. 797 (A.C.M.R.1991) (blowing nose on the American flag is "expressive conduct" which may be punished under certain circumstances). Thus, if the appellant's presentations to the high school assemblies were "disloyal," these precedents would permit us to decide the issue without more. Because the appellant's conduct involves a "false speech" and not a "disloyal speech," the conduct differs materially from that of Doctor Levy and other servicemembers in the cases cited above. Here we can discern no disloyalty in the appellant's presentations.[4] This unique aspect requires us to go further.

■ "Some acts by their very nature are prejudicial to good order and discipline or

---

**4.** Indeed, it is quite possible that Sergeant Stone was motivated, at least in part, by a misplaced patriotic zeal, perhaps fueled by the national

and media interest in events taking place at that time in the Persian Gulf.

of a nature to bring discredit upon the armed forces. They generally are offenses that involve a degree of moral turpitude." *United States v. Light*, 36 C.M.R. 579, 584 (A.B.R.1965). *See also United States v. Greene*, 34 M.J. 713 (A.C.M.R.1992). Unless the acts charged as service-discrediting are, by their very nature, discrediting, the circumstances under which they were committed must be examined before such a determination may legitimately be made. *Guerrero*, 33 M.J. 295; *United States v. Davis*, 26 M.J. 445 (C.M.A.1988); *United States v. Lowe*, 4 U.S.C.M.A. 654, 16 C.M.R. 228 (1954); *United States v. Hunt*, 34 M.J. 779 (A.C.M.R.1992); *United States v. Dallman*, 32 M.J. 624 (A.C.M.R.1991), *rev'd on other grounds*, 34 M.J. 274 (C.M.A.1992). We find that a servicemember does not have the unlimited freedom to make a false official presentation to a public forum. We hold that giving a "false speech" in a public forum may constitute in some circumstances an offense under Article 134, UCMJ, for which punitive sanctions may be imposed.

### 2.

■ We must next decide if the circumstances of this particular case permit criminal sanctions. We find that they do. This case does not involve a truthful account by a war veteran of his wartime exploits, nor does it involve even a substantially truthful account. If such were the case, even if the account were unflattering to the military, we would have concerns about the viability of this conviction in light of the First Amendment and in light of the limited reach of Article 134, UCMJ. However, under the facts of this case, we have no such reservations.

■ Nor do we have any reservations that the appellant was on notice that his conduct was service-discrediting. As a senior noncommissioned officer, it is reasonable to assume that he would be aware of the effect his remarks would have if and when exposed as false. *See Guerrero*, 33 M.J. at 297–98.

In the present case, the appellant's presentations were complete falsehoods. The effect of his deceit, once it became known to those who heard him, was predictably discrediting to the armed forces. Under the circumstances presented here, the government had the authority to regulate the conduct of the appellant and to impose punitive sanctions for that conduct.

### 3.

Finally, appellate defense counsel argues that the record is devoid of evidence that the appellant's "false speech" brought discredit upon the armed forces. Moreover, counsel argues, it was not even embarrassing to the government because the speech was warmly received by the students and the press. The government counters that the evidence, *together with evidence of the action's aftermath*, clearly shows discredit to the armed forces.

■ In deciding this issue, we will assume, *arguendo*, that the appellant's conduct in making presentations to two high school assemblies was not inherently discrediting and will examine the circumstances surrounding those presentations. Included in those circumstances, we believe, is a consideration of the aftermath of the appellant's presentations; that is, the effect of the presentations after the falsity of the appellant's story became known. *See generally Greene*, 34 M.J. at 714.

■ The test we must use for determining factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, this court is itself convinced of the appellant's guilt beyond a reasonable doubt. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Turner*, 25 M.J. 324 (C.M.A.1987). The test for legal sufficiency is whether, considering the evidence in a light most favorable to the government, the trier of fact could rationally find the existence of every element of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ We agree with government appellate counsel that there was sufficient evidence presented by which the court-martial and this court can find service-discrediting

conduct. Having reviewed the record, we find that the evidence presented at trial is legally and factually sufficient to prove that the appellant's conduct was service-discrediting. The government provided ample evidence of a diminished confidence by those who heard the appellant in the integrity of servicemembers in general. Several students, a teacher, and the newspaper reporter expressed a new distrust in the truthfulness of service personnel as a result of the appellant's activity. The presentation, we note, occurred at a moment in time when confidence in the military by its nation was especially important. We hold that, under the circumstances, the evidence presented at trial legally and factually proved the allegations against the appellant regarding making a service-discrediting speech.

## II. The Pretrial Investigation Issues

### A. *Facts*

As a result of the appellant's high school speaking activities (and as the result of unrelated sexual activities with the fourteen-year-old adopted daughter of a good friend), charges were preferred against the appellant on 22 April 1991. CPT N was appointed to represent the appellant. Because of the impending permanent reassignment of CPT N, the appellant agreed to be represented by CPT N during the pretrial processing of his case and then to turn the case over to a successor defense counsel, CPT B, who would represent the appellant at trial.

Before referral of the charges to trial, Captain N began negotiations with the trial counsel for a pretrial agreement for the appellant. Apparently during these preliminary negotiations, CPT N and the trial counsel discussed waiver of the Article 32 pretrial investigation as an inducement for the convening authority's acceptance of the agreement. Prior to submission of the agreement to the convening authority, CPT

N, with the apparent knowledge and consent of the appellant, verbally waived the pretrial investigation. Based on the oral waiver of the pretrial investigation, the staff judge advocate forwarded the charges to the convening authority for his decision regarding disposition of the charges. The convening authority referred the charges to a general court-martial on 6 May 1991. The next day, CPT N confirmed the oral waiver by submitting a written waiver of the pretrial investigation signed by CPT N and the appellant. The written waiver did not contain any mention of it being contingent upon acceptance of a pretrial agreement, but did contain a statement that "[t]he defense reserves the right to withdraw this waiver and proceed with the investigation of the charges under U.C.M.J. Article 32." On 13 May, CPT N submitted a proposed pretrial agreement (the document is dated 7 May) signed by CPT N and the appellant. This proposed agreement made no mention of the waiver of the pretrial investigation, and specifically stated that the writing contained all the provisions of the agreement. The convening authority rejected the proposed pretrial agreement on 13 May.

On 14 May 1991, CPT N served the trial counsel with written notice of the appellant's withdrawal of the waiver of the Article 32 investigation. That same date, at the first court-martial session conducted pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a), CPT N presented a copy of the written notice to the military judge and moved to withdraw the waiver of the Article 32 investigation. In offers of proof, CPT N and the trial counsel disagreed as to whether there existed an unwritten understanding that the waiver of the pretrial investigation was contingent upon the successful completion of a pretrial agreement. The written waiver, withdrawal of the waiver, and unsuccessful pretrial agreement were entered into evidence; neither side called witnesses on the motion.[5] Fol-

---

5. In an effort to bolster CPT N's offer of proof at trial, CPT N and the appellant have now submitted affidavits to this court asserting that the waiver was contingent upon a pretrial agreement. Both affidavits assert that CPT N, during

negotiations on the pretrial agreement, within hearing of the appellant, discussed the contingent waiver with the trial counsel in a telephone conversation. The appellant further asserts in his affidavit that he would not have agreed to

lowing the offers of proof and arguments, the military judge made the following findings:

> First, the accused has knowingly and intelligently waived the Article 32(b) investigation and that the waiver is valid;

> Secondly, that although subjectively contingent to the defense the court finds the convening authority was justified in accepting the waiver and referring the case to trial on 6 May 1991;

> Third, the court finds that neither Appellate Exhibit I, the Article 32(b) waiver or Appellate Exhibit III, the pretrial [agreement] offer, referred to the waiver as part and parcel of the pretrial offer;

> Fourth, the court further finds that [the] defense has failed to establish good cause required by Rule 405(k) of the Manual for Courts–Martial[6] and *United States versus Nickerson* [27 M.J. 30 (C.M.A.1988)].

The military judge then denied the motion to withdraw the waiver, initially docketed the case for trial on 20 May, and redocketed it for 13 June at the request of the defense.[7]

### B. *Discussion*

In resolving the appellant's two related assignments of error regarding the Article 32 pretrial investigation, we must decide whether there was a valid waiver of the pretrial investigation and whether the military judge erred in denying the request for the investigation at trial.

■ No charge may be referred to a general court-martial for trial until a thorough and impartial investigation of the charges has been conducted. Article 32(a), UCMJ; R.C.M. 405(a). However, R.C.M. 405(k) provides that an accused may waive this pretrial investigation. Once the investigation has been waived, relief from the waiver may be granted by the investigating officer, the commander who ordered the pretrial investigation, the convening authority, or the military judge as appropriate. R.C.M. 405(k). The standard to be used for granting relief from the waiver is "for good cause shown." *Id.*

■ The Court of Military Appeals has held that an accused does not have an absolute right to revoke a valid waiver of a pretrial investigation. *Nickerson*, 27 M.J. 30.[8] An issue involving revocation of a waiver is left to a military judge whose decision will not be upset or disregarded on appeal unless "clearly erroneous." *Id.* at 31–32. The military judge's ultimate ruling involves a question of law. *Id.* at 32. The burden of proof rests with the appellant. *Id.* At issue in this appeal, therefore, is whether the military judge's ruling to disallow revocation of the waiver was clearly erroneous.

■ We find that there was a valid oral waiver (followed the day after referral with a formal written waiver) of the Article 32 investigation, and that the convening authority was well within his discretion to refer the charges to trial.

Further, we find no "clearly erroneous" ruling or abuse of discretion by the military judge. Based on the information presented to him, the military judge was cor-

---

the waiver but for CPT N's assurance that the waiver was contingent on a successful pretrial agreement.

6. Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 405(k) [hereinafter R.C.M.].

7. The trial on the merits actually began on 19 June with CPT B, the successor defense counsel, representing the appellant. On 3 June, the government preferred additional charges and thereafter conducted an Article 32 investigation as to these additional charges. There is no evidence of record that counsel sought to relitigate the motion given the changed circumstances.

These additional charges were later severed from the original charges by the military judge.

8. Like the case before us, *Nickerson* involved the waiver of a pretrial investigation made contemporaneously with the offer of a pretrial agreement. In *Nickerson*, unlike the present case, the pretrial agreement was approved by the convening authority, and Nickerson attempted to withdraw the waiver, apparently, only after entering improvident pleas of guilty. Similar in both cases was an allegation by the accused and his counsel to the military judge that the waiver was contingent on the pretrial agreement. Also similar was a lack of support for those allegations in the documents themselves.

rect in his ruling. We find that his findings of fact and conclusions of law are supported by the evidence of record.

We find that belated submission of affidavits to us from CPT N and the appellant is an attempt to relitigate the motion *ab initio* on appeal. The appellant could have testified at trial but did not; his failure to testify is not explained.[9] We hold that the appellant failed to show good cause for the military judge to permit the appellant to withdraw from an otherwise valid waiver.

### C. *Ineffectiveness of Counsel*

The appellant now asserts that CPT N provided ineffective assistance of counsel regarding the waiver of the Article 32 investigation. We disagree.

Using the appellant's and CPT N's affidavits as a springboard, appellate defense counsel in his original brief and in oral argument attempted to create a "conditional ineffectiveness of counsel" allegation. After specifically asserting that neither the appellant nor appellate defense counsel believed that CPT N was ineffective, appellate counsel further asserted that if we found that CPT N waived the pretrial investigation, then that counsel was ineffective for engaging in *ultra vires* negotiations. That theme is continued in the brief submitted in support of the supplemental assignment of error. Counsel's theory is that the appellant only authorized a contingent waiver; CPT N, in effect, must have gone beyond this authority by unconditionally waiving the pretrial investigation. In addition, appellate defense counsel asserts that CPT N was ineffective by not calling the appellant as a witness on the motion.

 The Sixth Amendment right to counsel includes the right to effective representation of counsel. *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). *See also Lockhart v. Fretwell,* — U.S. —, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) and *United States v. Murphy,* 36 M.J. 1137, 1145–46

(A.C.M.R. 30 March 1993) *(en banc)* (the test is not solely a mere outcome determination but whether the result of the proceeding was fundamentally unfair or was unreliable). Under *Strickland,* a counsel's performance is presumed to be competent. To overcome this presumption, an appellant must point out specific errors made by his defense counsel that were unreasonable under prevailing professional norms. *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). *Strickland* requires that an appellant asserting ineffectiveness of counsel demonstrate that his defense counsel's performance was deficient, and that the deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Absent some effect of the challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated. *Cronic,* 466 U.S. at 658, 104 S.Ct. at 2046. A criminal defendant alleging ineffectiveness of counsel must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. The proper standard for judging attorney performance is that of reasonably effective assistance, taking into account all of the circumstances, using an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. at 2064. Errors of professional judgment must be "so serious that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." *Id.* at 687, 104 S.Ct. at 2064.

 The *Strickland* standard for determining ineffectiveness of counsel is applicable to courts-martial practice. *United States v. Scott,* 24 M.J. 186 (C.M.A.1987).

To show that his trial defense counsel was ineffective, an accused must demonstrate that his counsel was seriously deficient in some manner and that there is a reasonable probability that, but for this

---

9. We look with some suspicion at attempts to bolster the trial record through the use of affidavits. *See United States v. Perkinson,* 16 M.J. 400, 402 (C.M.A.1983). However, we have considered the affidavits, and find that they do not

change our decision as to the issues regarding ineffectiveness of counsel, waiver of the Article 32 investigation, and the military judge's ruling thereon.

deficiency, the result of the proceeding would have been different.... In weighing such matters, we must give deference to counsel's tactical judgment and not substitute our view with the benefit of hindsight.

*United States v. Bono,* 26 M.J. 240, 242 (C.M.A.1988); *United States v. Holt,* 33 M.J. 400 (C.M.A.1991); *Murphy,* 36 M.J. 1137 (A.C.M.R.1993). Counsel's performance is not required to be error-free. *United States v. Brown,* 33 M.J. 743, 745 (A.C.M.R.1991), *pet. denied,* 35 M.J. 252 (C.M.A.1992); *United States v. Barnard,* 32 M.J. 530, 532 (A.F.C.M.R.1990), *pet. denied,* 33 M.J. 484 (C.M.A.1991).

█ In reviewing the record, we find no evidence whatsoever to support the appellant's assertion that his counsel engaged in *ultra vires* acts. Further, we do not find that the defense counsel's failure to call the appellant as a witness on the motion is ineffective assistance of counsel as defined by *Strickland, Scott,* and their progeny. Assuming, *arguendo,* that the counsel's failure to call the appellant as a witness on the motion was error, it was a tactical error not amounting to ineffective assistance of counsel.

█ In the original brief filed in this case, the appellant and his appellate counsel stated that they did not believe that the trial defense counsel was ineffective. We agree with that initial conclusion. The arguments now presented to support a contrary position do not convince us otherwise. We hold that the appellant has failed to demonstrate that his trial defense counsel was ineffective under the standards of *Strickland v. Washington.*

### III. Withholding of Information

#### A. *Facts*

During its case on the merits, the government presented the testimony of Master Sergeant (MSG) Y, a Special Forces soldier who had been stationed in Saudi Arabia, regarding the impact of the story on Special Forces personnel when they became aware of it. On the day following trial, the trial counsel notified the defense counsel that MSG Y was under investigation by the Army's Criminal Investigation Command (CID) for travel fraud. The trial counsel was aware of this investigation prior to trial and neglected to notify the defense counsel even after a defense discovery request specifically inquired if any of the government witnesses were under investigation. Having learned of the investigation of MSG Y, the defense counsel raised the discovery issue in his post-trial submissions to the convening authority. The defense counsel asked for no relief other than a reduction in sentence. The staff judge advocate, in an addendum to his post-trial recommendation, advised the convening authority that the failure to disclose was an oversight, was without malicious intent, and the oversight did not prejudice the appellant.

#### B. *Discussion*

Before this court, appellate defense counsel argues that *United States v. Eshalomi,* 23 M.J. 12 (C.M.A.1986), and R.C.M. 701 impose a higher standard upon the government relative to discovery than does the constitutional standard; and, that the error should be presumed harmful and warrants a complete rehearing of the case. The government does not dispute that the trial counsel knew that MSG Y was under investigation for travel fraud and failed to disclose the information after a specific written discovery request for information of this type. However, the government asserts that the error is harmless because MSG Y's testimony related solely to the question whether the appellant's conduct was "prejudicial to good order and discipline." Since the military judge specifically excepted this phrase in announcing his findings of guilty, there can be no harm. Citing *United States v. Watson,* 31 M.J. 49, 54 (C.M.A.1990), counsel for the government argue that relief is required only if the failure to disclose casts a reasonable doubt on the validity of the proceedings. We agree that this is the correct test to be applied here. *See also Eshalomi,* 23 M.J.

at 22.[10]

■ In the case before us, we find that it was error for the trial counsel, in response to a specific discovery request, to fail to disclose that one of the government's witnesses was under criminal investigation. However, we agree with the government and hold that the failure to disclose did not cast a reasonable doubt on the validity of the proceedings and was therefore harmless.

## IV. Admissibility of Aggravation Evidence

### A. *Facts*

■ As part of its case on sentencing, the trial counsel introduced without objection a number of documents, including an order from the U.S. Army Recruiting Command revoking the appellant's badge as an Army recruiter. The trial counsel also moved to introduce a contemporaneous report of the results of an investigation from this same command.[11] The report contains a statement that the Commanding General had determined that [the appellant] "committed a recruiting impropriety by wrongfully threatening an applicant with prosecution if he failed to report to active duty and committed additional misconduct by making sexual harassment comments, allowing misuse of government vehicles, and lying to the investigating officer." The report further states that the Commanding General directed that the appellant "be re-

lieved, reclassified, and reassigned" as "unsuitable" for recruiter duty under provisions of Army Regulation 601–1, that he was ineligible for future recruiting duty, and that the appellant's "records will be so annotated." [12]

The trial counsel's basis for proffering the document was that it was a "personnel record of the accused and the Government offers it under [Rule for Courts–Martial] 1001(b)(2), characterization of prior service." [13] The defense counsel's sole objection to the document was that the prejudice caused by the uncharged misconduct in the document outweighed its value to the court in determining a sentence, citing Manual for Courts–Martial, United States, 1984, Mil.R.Evid. 403. The military judge overruled the objection and admitted the document. Thereafter, the trial counsel used information from the report in cross-examining the appellant's sentencing witnesses and in final argument.

When the defense counsel later asked to call a witness to rebut the information in the report, the military judge characterized the report as "just the [Commanding General's] determination much like a Article 15, that he thought these things occurred," and refused to permit testimony to "relitigate" the action relieving the appellant from recruiting duties.

### B. *Discussion*

Rule for Courts–Martial 1001(b)(2) provides that the prosecution may present dur-

10. We note that the Court of Military Appeals recently held that there is no absolute right under the Sixth Amendment to background information concerning a hostile witness. *United States v. Lonetree,* 35 M.J. 396, 405–10 (C.M.A. 1992), *cert. denied,* — U.S. —, 113 S.Ct. 1813, 123 L.Ed.2d 444 (1993). In *Lonetree,* after a lengthy analysis of Supreme Court and federal Sixth Amendment precedents, the court found no error in the military judge's ruling that prohibited Lonetree from discovering a covert agent's real name and background during cross-examination of that agent. After finding no error, the court agreed with the Navy–Marine Corps Court of Military Review that, even if error occurred, it was harmless beyond a reasonable doubt. *Lonetree,* at 410–11.

11. The trial counsel indicated on the record that the report of investigation consisted of three pages. Only one page was included in the rec-

ord of trial. By affidavit, the trial counsel now admits she misspoke: the exhibit actually consists of two pages. That second page has been added to the record by a certificate of correction, mooting the appellate defense counsel's assertions that the record is incomplete.

12. We judicially note that Army Reg. 601–1, Assignment of Enlisted Personnel to the U.S. Army Recruiting Command (22 April 1987) (the version in effect at the time of the appellant's involuntary reassignment) mandates an administrative due process procedure prior to reassignment for unsuitability of recruiting personnel. There was no assertion at trial that these procedures were violated.

13. On the margin of the document is a handwritten certificate by an adjutant that the document is a true copy of the original.

ing the presentencing proceedings evidence bearing on the character of prior service of the accused:

> Under regulations of the Secretary concerned, trial counsel may obtain and introduce from the personnel records of the accused evidence of the accused's marital status; number of dependents, if any; and character of prior service. Such evidence includes copies of reports reflecting the past military efficiency, conduct, performance, and history of the accused and evidence of any disciplinary actions including punishments under Article 15.

> "Personnel records of the accused" includes any records made or maintained in accordance with departmental regulations that reflect the past military efficiency, conduct, performance, and history of the accused. If the accused objects to a particular document as inaccurate or incomplete in a specified respect, or as containing matter that is not admissible under the Military Rules of Evidence, the matter shall be determined by the military judge. Objections not asserted are waived.

Military Rule of Evidence 403 provides that:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

██ Evidence of specific incidents of uncharged misconduct is admissible as aggravation under R.C.M. 1001(b)(4) so long as it relates to rehabilitative potential of the accused. *United States v. Hall*, 29 M.J. 786 (A.C.M.R.1989), *aff'd*, 31 M.J. 431 (C.M.A.1990) (summary disposition). However, there are limits to admissibility. For instance, admission into evidence of documents containing mere allegations of wrongdoing, such as an arrest report, can be prejudicial. *United States v. Zengel*, 32 M.J. 642 (C.G.C.M.R.1991).

██ In determining whether the probative value of uncharged misconduct outweighs its prejudicial impact, the military judge is accorded broad discretion, and his decision will not be overturned unless that discretion is abused. *United States v. Taylor*, 21 M.J. 840 (A.C.M.R.1986); *United States v. Woodyard*, 16 M.J. 715 (A.F.C.M.R.1983). *See also United States v. Ross*, 34 M.J. 183 (C.M.A.1992) (Cox, J., concurring). Finally, the fact that the trial was conducted before a military judge alone is a factor to be considered in our determination of this issue. *See, e.g., United States v. Mays*, 33 M.J. 455 (C.M.A.1991) (military judge presumed to know the law and to consider matters only for the purpose for which they were admitted).

In the present case, the defense counsel's sole objection was limited to asserting that the probative value of the uncharged misconduct contained in the exhibit "substantially outweighed the danger of unfair prejudice." All other objections to admissibility of the document were waived. *See* R.C.M. 1001(b)(2).

██ We find that the specific incidents of misconduct described in the report of investigation related to the appellant's past military performance and to his potential for rehabilitation, and that the report of investigation itself was qualitatively better than a mere arrest record, such as described in *Zengel*. We further find that the military judge did not abuse his discretion here. It is evident from the military judge's comments that he accorded this particular sentencing exhibit the proper weight that it deserved. Even assuming, *arguendo*, that admission of the document was error, we are confident that it was harmless. In light of the other aggravation evidence offered without objection by the government and the serious nature of the offenses of which the appellant was convicted, including sexual misconduct with a child, we are sure that the military judge would not have imposed a less severe sentence had the exhibit not been introduced into evidence.

Finally, the appellant personally asserts, pursuant to *United States v. Grostefon*, 12

M.J. 431 (C.M.A.1982), that the evidence is insufficient to sustain his conviction of carnal knowledge as alleged in Specification 2 of Charge I; and, that he is entitled to administrative credit for fifty days of pretrial restriction. We have examined these issues and find them to be without merit.

The findings of guilty and the sentence are affirmed.

Senior Judge JOHNSON and Judge WERNER concur.