BAKER, Judge
(dissenting):
I respectfully dissent for two reasons.
First, I do not agree with the majority’s conclusion that no rational trier of fact could find that under the circumstances, the posting of Appellant’s AOL profile was “of a nature to bring discredit upon the armed forces.” Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000). Indeed, the majority concludes that there is “[n]o evidence ... introduced as to either the actual or potential adverse impact of Appellant’s online profile or statements on good order and discipline or to the actual or potential discredit to the armed forces.” United States v. Wilcox, 66 M.J. at 446 (C.A.A.F. 2008). To the contrary, a publicly available Internet profile that: (1) indicates that the profile is posted by an “Army Paratrooper” at Fort Bragg; (2) gives the paratrooper’s name as “Wskullhead”; and (3) indicates his race as “Aryan” and that he is a pro-white activist (among other things) is of a nature to bring discredit upon the Army. More to the point, from a legal sufficiency standpoint the Government is not required to offer direct proof of discredit; a rational trier of fact is allowed to reasonably draw such an inference from proof of the circumstances surrounding the conduct at issue.
Second, having concluded that “the sole issue presently before the Court is whether the evidence is legally sufficient to support the second element of the attenuated version of the charged Article 134, UCMJ, offense,” id. at 445, the majority nonetheless considers constitutional questions that might otherwise be raised if the evidence were legally sufficient. Generally, courts should avoid constitutional questions where cases are properly resolved on other grounds. Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932) (“When the validity of an act of the Congress is drawn in question, and ... a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.”); accord, e.g., Haynes v. United States, 390 U.S. 85, 92, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968) (dictum); Schneider v. Smith, 390 U.S. 17, 27, 88 S.Ct. 682, 19 L.Ed.2d 799 (1968); United States v. Rumely, 345 U.S. 41, 45, 73 S.Ct. 543, 97 L.Ed. 770 (1953); Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).
As a result, it is not clear what relationship, if any, this constitutional discussion has to the Court’s conclusion regarding legal sufficiency. In my view, one does not reach the constitutional questions in this case unless one first concludes that the evidence would otherwise be legally sufficient, at which point the question becomes whether the conduct is constitutionally protected as free speech. For the reasons stated below, Appellant’s profiles fell outside the zone of free speech protection; the Government had a compelling interest in regulating Appellant’s speech and did so using narrowly tailored means.
SUFFICIENCY OF THE EVIDENCE
This case is not a model of clarity, or much else. But the question remains: Was there legally sufficient evidence presented to the military judge such that “after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact” could have found beyond a reasonable doubt that *453 Appellant’s posting of his AOL profile was of a service discrediting nature? Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In my view, the evidence is sufficient.
First, Appellant’s two AOL profiles were entered into evidence and were before the military judge as trier of fact. So were Appellant’s e-mail exchanges with Investigator Sturm, also known as, “Country Bumpkin,” an undercover Army CID agent playing the role of a fellow traveler on the road of racial extremism.
Second, the statements were intended for a wider audience, and therefore demonstrated a tendency to discredit. The record — or reasonable inferences drawn from the record — indicates that Appellant’s AOL profiles were posted on the Internet and were (at least) available to AOL subscribers. As to who had access to such profiles, Investigator Sturm testified, “It can be anyone that has an AOL account or is online.” In any event, the profiles were available to members of the public.
Third, there is sufficient evidence that this conduct reflected disrepute on the armed forces. The profiles identified Appellant as an “Army Paratrooper” and “Army/Paratrooper” respectively. For “location,” Appellant entered, “Fort Bragg.” One profile includes a thumbnail picture of Appellant with close-cropped hair.
Fourth, the profiles included the following statements, and included a hyperlink to a website associated with the white supremacy extremist and convicted murderer David Lane:[1]
I’d also like to say ...
I am a Pro-White activist doing what I can to promote the ideals of a healthier environement [sic]. I do not base my deeds on Hate, but that of love for my folk’s women & children. Political Affiliation is none— This government is not worth supporting in any of its components. Natures [sic] and God’s laws are eternal — Love your own kind & fight for your own kind. There’s no “HATE” in that!
Personal Quote: “We must secure the existence of our people, and a future for white children” THE 14 WORDS — written by imprisoned matyr [sic] David Lane www.14words.com.
In response to this evidence, the majority makes four arguments in concluding that the evidence was legally insufficient to prove a tendency to discredit.
First, the majority argues that “the racist views propounded on the Internet by a single person purporting to be a paratrooper” would not be viewed as an expression of Army policy. There are three problems with this argument. First, Appellant did not “purport” to be an Army paratrooper; he was an Army paratrooper. Second, service discredit is not hinged to service policy. To the contrary, service discredit is likely to occur precisely because the conduct in question does not reflect service policy or values. This Court, for example, has consistently upheld convictions under the second clause of Article 134, UCMJ,[2] for viewing child pornography; we have done so because service-members discredit the armed forces when they view pornography, not because the public or the courts might believe the viewing of child pornography is military policy. Third, even when conduct is contrary to express military policy, a failure to punish such conduct may nonetheless suggest or reflect to the public military tolerance for the conduct in question.
Second, the majority argues that “no evidence was produced that the profiles were directed at other members of the military.” Wilcox, 66 M.J. at 451. This might be relevant if Appellant had been charged alone with conduct of a nature to prejudice good order and discipline, but he was charged in the alternative with conduct that had a ten *454 dency to discredit the armed forces. It has long been the case in military law that the discrediting nature of conduct alleged under Article 134(2), UCMJ, is assessed from the perspective of the public. United States v. Thompson, 3 C.M.A. 620, 623, 14 C.M.R. 38, 41 (1954).
Here, I agree with the majority’s facts, but not its conclusion. The legal analysis correctly focuses on the profiles, because the Government did not offer evidence that Appellant sought to proselytize racism within his unit, or otherwise take steps that would constitute threats to good order or discipline. Indeed, as the majority points out, the defense presented evidence to the contrary. In United States v. Gray, 20 C.M.A. 63, 68, 42 C.M.R. 255, 260 (1970), the Court concluded “the evidence must establish ‘reasonably direct and palpable’ prejudice to good order and discipline,” but the first half of this conclusion gives the reason: “Since the statement was published on a military reservation and only military persons were involved.” The inverse is true here. The evidence — the profiles — indicates that Appellant’s efforts were directed outward to the public on the Internet.
Third, the majority argues that “no evidence was produced that ... any military member other than the investigators stumbled upon them or was likely to do so.” Wilcox, 66 M.J. at 451. As noted above, with respect to the issue of discredit, the relevant audience is not the military, but the public at large. Here, the investigator testified that the profiles were available to AOL account holders. Moreover, the critical test is not whether Appellant caused discredit, but whether his conduct had a tendency to do so. United States v. Saunders, 59 M.J. 1, 11 (C.A.A.F.2003) (“The test of service discredit is whether Appellant’s acts had a ‘tendency to bring the service into disrepute[.]’ ”) (citation omitted). Thus, while it is hard to argue that something could have a tendency to cause discredit if it is impossible for others to become aware of the conduct, it is not a requirement that the Government prove actual awareness on the part of the public.
Fourth, the majority argues, “[n]or did the Government provide any evidence that either servicemembers or members of the general public would even understand the source of the quoted ’14 Words’ or other language.” Wilcox, 66 M.J. at 451. I think the words speak for themselves: “We must secure the existence of our people, and a future for white children”; “I am a Pro-White activist”; and “W/boy seeks White female.”
Putting aside the plain meaning of the words, the majority’s position ignores the rationale for the standard set forth in Jackson which “gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.” 443 U.S. at 319, 99 S.Ct. 2781. The question presented is whether a rational trier of fact might reasonably infer or conclude that the words were racist, extremist, and service discrediting.
Any rational trier of fact as well as the general public would understand that these are racist words.[3] But if there was any confusion regarding the racist nature of these words, Appellant’s profile entry for “ethnicity” might help out: “White (propper [sic] historical name is ‘Aryan’).” This same trier of fact might then reasonably infer that these racist words uttered in the form of a personal quote from an “Army Paratrooper” might have a tendency to discredit the Army.
Finally, in United States v. Guerrero, 33 M.J. 295 (C.M.A.1991), a cross-dressing ease, this Court concluded “it is not the [conduct] per se which gives rise to the offense. Rather, it is (1) the time, (2) the place, (3) the circumstances, and (4) the purpose for the [conduct], all together, which form the basis for determining if the conduct is ‘to the *455 prejudice of good order and discipline ... or was of a nature to bring discredit upon the armed forces.’ ” Id. at 298 (citation omitted). Therefore, the “circumstances” of the posting of Appellant’s AOL profile, including the email conversations between Appellant and Investigator Sturm are relevant on the question of legal sufficiency.
One of Appellant’s purposes for posting the profile was to attract like-minded individuals to whom he could espouse his white supremacist views and to whom he could deliver propaganda devoted to these views. He sought to facilitate this endeavor by holding himself out as a member of the armed forces, an “Army Paratrooper.” The investigator’s testimony is rife with Appellant’s expression of his views, and some illustrations follow:
Q: Did [the accused] mention anything about racial views?
A: ... He says, [reading from an email] “Be cautious, they’re openly [atheist], but WAR’S [White Aryan Resistance] racial views are solid----”
Q: ... What, if anything, did you find out about the possible identity of Wskullhead ... ?
A: He identifies himself as PFC Wilcox and gives me his unit and his address.
Q: Okay; and, what books does he recommend to you?
A: The AST Bible.
Q: What is that?
A: ... “It is a Jew free bible translated from the Greek that Christ spoke (sic). It shows the bible was a pro-white religious writing and for God’s true covenant people.”
During a later colloquy between the trial counsel and the investigator, the witness describes how Appellant recommended she read a book entitled Vigil<mte[Js of Christendom:
Q: Does he ... talk about the action that the people took that are depicted in the book?
A: ... Yes. He states that they went out — “They didn’t ask for government permission or their neighbors’ approval, they just did it____”
Q: And he was referring to a killing of a race-mixed couple?
A: Yes, Ma’am.
While Appellant no longer faces charges related to these e-mail discussions, the testimony remains part of the record for sufficiency purposes and is relevant on the issue of the discrediting nature of the profile.
In summary, the military judge had before him abundant evidence to find specific conduct under circumstances having a tendency to discredit the armed forces or from which he could reasonably infer that such conduct had a tendency to discredit the armed forces.[4]
THE CONSTITUTIONAL QUESTION
Having concluded that the evidence is legally sufficient, the question becomes whether Appellant’s words might otherwise fall within a zone of protection as a constitutional exercise in free speech. This is a closer question than that presented on legal sufficiency.
At the start, it is critical to focus on the speech in question, as opposed to the figurative slippery slope. The question is:
Does the right to free speech enshrined in the First Amendment extend to a soldier who makes racist, service discrediting statements in a public manner while holding himself out as a member of the armed forces?
The question is not:
Does a soldier have a constitutional right to make racist, unpopular, or distasteful *456 statements in private to his comrades, or when not in uniform or otherwise holding himself out as a member of the armed forces?
This is a complicated question, in part because it is a novel question. “[T]he ‘search for the outer limits [of the First Amendment right]’ has, in the main, been restricted to the civilian and not to the military community and, even then, as we have said, the right is not to be exercised totally unrestricted.” United States v. Howe, 17 C.M.A. 165, 177, 37 C.M.R. 429, 441, (1967) (citation omitted), abrogated on other grounds by United States v. Frelix-Vann, 55 M.J. 329, 332 (C.A.A.F. 2001).
This Court has not had occasion to address a First Amendment challenge to the application of an Article 134(2), UCMJ, specification. The Court has addressed conduct unbecoming an officer and a gentleman under Article 133, UCMJ, 10 U.S.C. § 933, where a commissioned officer joined a public protest of the Vietnam conflict in civilian attire, carried a placard calling the President a fascist, and was recognized as an officer. See Howe, 17 C.M.A. at 167-70, 37 C.M.R. at 431-34.
The Court has also addressed Article 134, UCMJ, in the First Amendment context in “good order and discipline” eases; however, these cases are distinct from those involving service discrediting conduct in at least two ways. First, as a factual matter, the governmental interests at stake are necessarily more granular. That is to say, speech tending to prejudice good order and discipline is more easily identified because it will generally come in the form of words tending to incite riot or mutiny. Second, and more importantly, as a matter of law, speech charged as an offense prejudicial to good order and discipline under Article 134(1), UCMJ, leads logically, if not inexorably, toward the application of the clear and present danger-incitement test. For our Court, this test is drawn from United States v. Priest, 21 C.M.A. 564, 570, 45 C.M.R. 338, 344 (1972), which, of course, is drawn from the civilian test for incitement in Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). In both cases the critical question concerns the proximity of a potential immediate and concrete harm:
The question in every ease is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree.
Priest, 21 C.M.A. at 570, 45 C.M.R. at 345 (citing Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919)).
Further, the ease law is susceptible to multiple interpretations and applications. In United States v. Brawn, 45 M.J. 389, 396 (C.A.A.F.1996) (citation omitted), a legitimate interest standard was applied, “Courts will ‘not overturn a conviction unless it is clearly apparent that, in the face of a First Amendment claim, the military lacks a legitimate interest in proscribing the defendant’s conduct.’ ” However, in my view, the Brawn legitimate interest test does not adequately protect the liberty interests involved, for virtually anything might be viewed as a “legitimate interest” when national security is invoked. Howe is more analogous to the present case because it involved speech without apparent incitement. However, the Court in the end treated the case under the good order and discipline rubric, focusing on the more immediate of the two charges, that of contemptuous conduct under Article 88, UCMJ, 10 U.S.C. § 880 (2000). The Court concluded that the evil Congress sought to avoid is “the impairment of discipline and the promotion of insubordination by an officer of the military service in using contemptuous words toward the [Commander-in-Chief].” Howe, 17 C.M.A. at 173, 37 C.M.R. at 437. “That Article 133 affronts no constitutional concept has seemingly never been in doubt ____ The right to free expression is not here curtailed____ In truth, Article 133 concerns only the abuse of that right.” Id. at 176, 37 C.M.R. at 440 (citation omitted).
In short, this Court’s case law does not answer the question as to what constitutional test applies to service discrediting speech *457 prosecuted under Article 134(2), UCMJ. What test should apply?
There are at least five buoys that might help to mark the constitutional channel through the otherwise perilous shoal that skirts the boundary between free speech and national security.
First, there is the text of the amendment itself. “Congress shall make no law ... abridging the freedom of speech.” U.S. Const, amend. I. Free speech is a hallmark of democracy, especially and in particular where that speech is distasteful. A society that tolerates such speech is a strong society. It is a society that recognizes that the answer to a bad idea is a better idea.[5] In a democracy, a better idea is communicated through the exercise of free speech. That is but one reason why we cannot have democracy without free speech. Moreover, citizens cannot effectively safeguard their liberty and their security if they are not free to test, challenge, and question their government.
Second, the exercise of speech is free, but it is not unlimited. The Supreme Court in Brandenburg makes this clear, distinguishing between protected speech and speech that might nonetheless create an imminent condition of panic, alarm, or violence:
[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.
Brandenburg, 395 U.S. at 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (citing Dennis v. United States, 341 U.S. 494 (1951); Yates v. United States, 354 U.S. 298, 320-24, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957)).
Similarly, for example, one is not free to threaten the President in speech or conduct. United States v. Ogren, 54 M.J. 481, 482 (C.A.A.F.2001). In the military, as well, a servicemember may be prosecuted for using contemptuous words against the Commander-in-Chief, whether or not those words would be considered “free speech” in civilian society. Article 88, UCMJ; Article 133, UCMJ; Howe, 17 C.M.A. at 178, 37 C.M.R. at 442.
Third, the Supreme Court distinguishes between the content of speech and the time, place, and manner of speech; the Court is more permissive with respect to limitations on the time, place, and manner of speech. See generally Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). It affords more protection to the content of speech, even if the content restriction applies only within a particular time, place, or maimer. See Boos v. Barry, 485 U.S. 312, 319-20, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988).
More generally, and here is the critical point, as this distinction illustrates, the Court applies different First Amendment tests in different contexts. It is not a one-shoe fits-all approach. In Goldman v. Weinberger, 475 U.S. 503, 509, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986), superseded by statute on other grounds, Religious Apparel Amendment, Pub.L. No. 100-180, § 508(a)(2), 101 Stat. 1086 (1987), as recognized in Cutter v. Wilkinson, 544 U.S. 709, 722, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005), for example, the appellant — an Air Force officer — argued that a regulation restricting his First Amendment right to wear a yarmulke in uniform was unconstitutional “unless the accoutrements create a ‘clear danger’ of undermining discipline and esprit de corps.” However, the Court declined to apply the clear danger test, stating instead, “we hold that those portions of the regulations challenged here reasonably and evenhandedly regulate dress in the interest of the military’s perceived need for uniformity.” Id. at 510, 106 S.Ct. 1310. In Boos, a case involving restrictions on the right to protest outside embassies, the Court *458 applied a strict scrutiny-compelling interest analysis. 485 U.S. at 321, 108 S.Ct. 1157.[6]
In the context of this Court, it happens that one shoe has generally fit all, because our Article 134, UCMJ, cases have all been disorder eases, involving the risk if not the reality of incitement to disorder or threats to military discipline. Thus, we have not been compelled to explore the potential application of other tests in different factual contexts.
Fourth, the Constitution applies to members of the armed forces except in cases where the express terms of the Constitution make such application inapposite. United States v. Marcum, 60 M.J. 198, 205 (C.A.A.F. 2004). It is axiomatic that those who do so much to defend the Constitution as citizen-soldiers should also receive its benefits. Indeed, it is for the courts to ensure that this principle is not just a truism or slogan, but a meaningful reality. Moreover, the exercise of free speech can directly benefit good order and discipline, providing an important outlet for soldiers to vent and blow steam while operating in difficult circumstances.
Fifth, the Constitution and its safeguards — in particular those contained in the Bill of Rights — may apply differently in the military context. This is evident in the case of the Fourth Amendment, where determinations as to what is reasonable may well differ between the civilian home and the military barracks. It is also evident with respect to the First Amendment, where the Supreme Court has expressly stated:
While the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it.
Parker v. Levy, 417 U.S. 733, 758, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). As stated in Priest, the question becomes one of balance, “[T]he proper balance must be struck between the essential needs of the armed services and the right to speak out as a free American.” 21 C.M.A. at 570, 45 C.M.R. at 344. Or, as stated by Chief Judge Learned Hand, “ ‘In each case (courts) must ask whether the gravity of the “evil,” discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.’” Id. (quoting Dennis v. United States, 341 U.S. 494, 510, 71 S.Ct. 857, 95 L.Ed. 1137 (1951)).
Based on the foregoing, I reach the following legal conclusions. First, as the Supreme Court has made clear, different tests may pertain in different factual contexts. This seems especially apparent in the military context. The clear and present danger-incitement test is unworkable in the context of a service discrediting case involving speech. The test does not fit the context presented, neither in terms of describing the governmental and national interests that may be at stake, nor the interest of the servicemembers involved. In addition, the breathless urgency of “clear and present danger” does not fit as a threshold for the more indirect consequences of service discrediting conduct. Whereas threats to good order and discipline can be measured in proximity and scope, if the test is applied in good faith, it is not clear how matters of discredit alone might ever pass constitutional muster. Indeed, to the extent this Court regards the incitement test as the appropriate test for all Article 134, UCMJ, speech eases, it would seem that it is effectively determining that Article 134(2), *459 UCMJ, is generally unconstitutional if applied to exercises in speech.
Second, the most analogous civilian test to the service discrediting context is that pertaining to content-based restrictions — here the content restriction is on service discrediting speech. In the civilian context, content-based restrictions on speech are subject to exacting review in the form of the strict scrutiny test. Boos, 485 U.S. at 321, 108 S.Ct. 1157. Strict scrutiny requires the state to show that the “ ‘regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.’ ” Id. at 321-22, 108 S.Ct. 1157 (citing Perry Educ. Ass’n, 460 U.S. at 45, 103 S.Ct. 948; Board of Airport Comm’rs of Los Angeles v. Jews for Jesus, 482 U.S. 569, 572-73, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987); Cornelius v. NAACP Legal Defense and Educational Fund, Inc., 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)).
Third, as in other contexts, the test must be applied in the military context, balancing “between the essential needs of the armed services and the right to speak out as a free American.” Priest, 21 C.M.A. at 570, 45 C.M.R. at 344. Here, the distinction between service discrediting conduct and incitement to disorder may make a difference in outcome, not by application of the clear and present danger test, but because the discredit caused may be so diffuse or tangential to the government’s interests as to be outweighed by a servicemember’s interest in speech.
As Applied in This Case
Applying strict scrutiny analysis to the case at hand, two questions arise. First, what are the Government’s compelling interests in regulating Appellant’s speech through criminal sanction? Second, is the restriction narrowly tailored to achieve those compelling interests?
A. The Compelling Interests
There are at least three national interests that are at stake in the present case.
First, the Government has a compelling interest in preventing the advent and spread of hate groups within the armed forces. It is well established that the Internet is used as a recruiting mechanism for extremist groups, including racist groups.[7] As a result, it would seem beyond doubt that the Government would have a compelling interest in ensuring that the Army is not a breeding ground for extremist recruitment and potential breeding ground for acts of extremist violence.[8] The Government has a parallel interest in ensuring the Internet is not used by members of the armed forces to self-select for such recruitment or to foster such recruitment. Of course, that is exactly what Appellant was seeking to do in his communications with Investigator Sturm.
Second, the Government has a compelling interest in fostering the perception (and the fact) that the military is race-neutral, politics-neutral,[9] and disciplined. One difference *460 between a member of the public and a member of the military is that the state gives a member of the military permissive sanction to use force in the name of the state. Part of the understanding that comes with that permit is the expectation and responsibility that the threat of state-sanctioned violence will not be wielded for unlawful purposes. If civil society perceives the military as racist, or its members as racist, civilians will be less willing to tolerate and support the performance of essential military missions at home. These might include the provision of security at special events, homeland defense, and search, rescue, and security missions in the face of natural and man-made disasters beyond the capacity of local responders.[10] A military force that is perceived to be racist or undisciplined will be less effective in this myriad of civilian contexts in which they might be deployed at home. They may be neither trusted nor welcomed.[11] At which point, they may not be effective.
Third, the Government has a compelling interest, especially during time of conflict, in recruiting and sustaining an all-volunteer force of sufficient strength and quality to provide for the nation’s security and to sustain that security over time. As is well documented in the print media, meeting recruiting goals is an annual challenge.[12] Where members of the military bring discredit to the armed forces, including, and perhaps in particular, through the advocacy of racist views, the Government will have a more difficult time meeting its recruiting needs. What parents would want their daughter or son to serve in a unit they thought might be infected with white supremacists and closet skinheads? What soldier (other than a white supremacist) would want to have “Wskullhead” on his right or his left in combat? As this Court previously stated in Howe, “ ‘The Federal Government may punish utterances which obstruct its recruiting or enlistment service____’” Howe, 17 C.M.A. at 173, 37 C.M.R. at 437 (quoting Legislative Reference Service, Library of Congress, Constitution of the United States of America, Revised and Annotated, 196S 895 (Edward S. Corwin, Norman J. Small, & Lester S. Jayson eds., U.S. Government Printing Office 1964)).
Thus, it is evident that public support, recruiting, and the deterrence of extremist groups represent compelling governmental interests. However, a further constitutional *461 question remains. When balanced against Appellant’s free speech interests, is the impact of Appellant’s words too tangential in potential effect to warrant criminal sanction? This depends in part on whether the Article 134(2), UCMJ, sanction is narrowly tailored to protect the compelling interests at stake.
B. Article 131.(2), UCMJ, is Narrowly Tailored
If the government’s interests, meaning here the Nation’s interests, are sufficiently compelling to regulate hate speech, the question becomes is Article 134(2), UCMJ, narrowly tailored to achieve those interests? Applying the framework presented above, there are three potential limits on the reach of the discrediting service clause into the realm of protected First Amendment speech.
First, the Government has not sought to proscribe Appellant’s free speech generally. It has sought to proscribe his speech while in uniform, which is to say: (1) while he is identifying himself or otherwise holding himself out as an Army paratrooper, and (2) doing so in a public forum. Moreover, it is not Appellant’s distasteful words that are the source of sanction; it is the discrediting nature of those words in the context of the Government’s compelling interests. Merely distasteful words would not have the same effect on the Government’s interests. Nor would the failure by the Army to penalize merely distastefid words have the same effect on the military institution in public esteem.
Second, as noted above, the legal test in the military context involves two steps. The Government must have a compelling interesas) to protect and the Article 134(2), UCMJ, sanction must be narrowly tailored in application to protect that compelling interests). Then, in accordance with Priest, military judges and this Court must balance that interest against the servieemember’s speech interest in the context presented. Given the potential for a broad and uncertain application of the General Article, this balancing remains an essential additional safeguard on the protection of appropriate military speech.
Finally, Article 134(2), UCMJ, like Article 133, UCMJ, does not operate in a constitutional vacuum. To the contrary, military custom and practice as interpreted by this Court inform and delimit the potential reach of Article 134(2), UCMJ. Parker, 417 U.S. at 752-53, 94 S.Ct. 2547. As the Supreme Court noted in Parker with respect to Article 133, UCMJ, citing to history and tradition:
The Court of Military Appeals has likewise limited the scope of Art. 133. Quoting from W. Winthrop, Military Law and Precedents 711-712 (2d ed.1920), that court has stated:
“... To constitute therefore the conduct here denounced, the act which forms the basis of the charge must have a double significance and effect. Though it need not amount to a crime, it must offend so seriously against law, justice, morality or decorum as to expose to disgrace, socially or as a man, the offender, and at the same time must be of such a nature or committed under such circumstances as to bring dishonor or disrepute upon the military profession which he represents.” ’ ”
Id. at 753-54, 94 S.Ct. 2547 (quoting Howe, 17 C.M.A. at 177-78, 37 C.M.R. at 441-42).
For these reasons, I would find that the Government’s interests are compelling in this case. Of course, here, part of the problem in applying a First Amendment test to Appellant’s words is that it is hard to imagine that anything so absurd could present anything but a tangential threat to a compelling governmental interest. But, if Appellant’s speech contained on his profiles is protected speech, it is not hard to imagine the cascading effect on the military institution of additional members of the military took up this perceived mantle of free speech.
I would further conclude that Article 134(2), UCMJ, as applied in this case, is narrowly tailored to protect those compelling interests, provided the Article is limited in application to Appellant’s profiles. These profiles were public, racist, and identified Appellant as an Army paratrooper. Appellant also relied on his military identity to *462 advertise and advance his racist message and agenda.[13]
The fact that Appellant’s words appeared on the Internet on a profile does not transform this case from one of public conduct to one of private conduct. The Internet profile is the modern equivalent of standing on a street corner in uniform with a sign saying “I’m in the Army and I am a racist and Aryan extremist.” This may not be a busy corner — we should hope that it is not — but it is a public corner nonetheless. Indeed, where the Internet is concerned, the impact of the metaphorical back alley protest may be magnified in time and distance in a manner distinct from that taking place in an actual back road or alley. Persons from all over the world may see it, and at a time when the street protester in uniform has long ago put the placard away, the racist message on the Internet lingers.
As one professional military observer noted:
We cannot put the Internet genie back in the bottle. The World Wide Web is pervasive, unregulated, and a powerful molder of opinion. The average lance corporal ... today does not remember a time when there was no Internet, no camera cell phone, and no text messaging. In that context he/she is a “digital native.” This means of communication is as natural to him/her as a letter home was to ... previous generations. The status symbol today for the “wired generation” is how many friends you have on your MySpace or Facebook page. The difficult task for leaders ... is to convince them that once they put on the [uniform] everyone who sees them, even if it is through social media, sees them as representatives of the United States [military].[14]
We cannot put the Internet genie back in the bottle. Nor should we hope or wish to. The genie is a source of morale in the field. It is a means of familial communication. And, it is a ubiquitous instrument that allows each bad idea to be met by a better idea. What we can do is ensure that it is not used to discredit the armed forces and undermine compelling national interests. This is done through education, appropriate and lawful regulation, and where necessary, criminal sanction; and, where speech is involved, through application of an exacting constitutional review.

. Lane, a founder of the white supremacist organization, The Order, died in prison while serving a life sentence for, among other things, the 1984 murder of radio talk show host Alan Berg. Anti-Defamation League, David Lane, White Supremacist Terrorist Ideologue, Dies in Prison, http ://www.adl.org/main_Extremism/davidJiane_ dies.htm.

. Hereinafter referred to as Article 134(2), UCMJ.

. As an aside, I also believe that most military judges would have a common understanding, after the Alfred P. Murrah Federal Building bombing — commonly referred to as the Oklahoma City Bombing — and the spate of domestic terrorism by white supremacists in the 1990s, of who David Lane was and what he and his "14 Words” stood for. But that is not the basis on which I would find legal sufficiency. In my view, any rational trier of fact would understand these profiles as racist. The words speak for themselves.

. The majority asserts that the dissent’s discredit analysis is based on extra-record material and concludes that "this would be a very different case” were this material part of the record. However, the material that demonstrates discredit is part of the record. The profiles were admitted into evidence and are part of the record, as is testimony regarding their public availability, as well, of course, as any reasonable inferences drawn from both sets of evidentiary facts.

. Alfred Whitney Griswold, historian and president of Yale University, 1950-1963, in Essays on Education (1954), and quoted in N.Y. Times, Feb. 25, 1959, said "Books won’t stay banned. They won't burn. Ideas won’t go to jail. In the long run of history, the censor and the inquisitor have always lost. The only sure weapon against bad ideas is better ideas. The source of better ideas is wisdom. The surest path to wisdom is a liberal education.”

. Also, it is interesting to note that the Supreme Court has applied varied tests in the context of First Amendment challenges to regulations intended to preserve order through the regulation of speech. See, e.g., Cutter, 544 U.S. at 723 n. 11, 125 S.Ct. 2113 (discussing standard contained in the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) to penal context, "Courts ... may be expected to recognize the government's countervailing compelling interest in not facilitating inflammatory racist activity that could imperil prison security and order”); Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), superseded by statute on other grounds, Religious Freedom Restoration Act of 1993, Pub.L. No. 103-141, § 2, 107 Stat. 1488, as recognized in Jolly v. Coughlin, 76 F.3d 468 (2d Cir.1996) (applying rational basis test).

. See, e.g., Staff of the S. Comm, on Homeland Security and Governmental Affairs, 110th Cong., Violent Islamist Extremism, the Internet, and the Homegrown Terrorist Threat (Comm. Print 2008); Stephan Tally, The Method of a Neo-Nazi Mogul, N.Y. Times, Feb. 25, 1996 (Magazine); Hate on the Internet: Before the S. Comm, on the Judiciary, 106th Cong. (1999) (statement of the Anti-Defamation League on hate on the Internet), available at http://judiciary.senate.gov/ oldsite/91499ad.htm; Beverly Ray & George E. Marsh II, Recruitment by Extremist Groups on the Internet, First Monday (2001) (unpaginated), available at http://www.firstmonday.org/issues/ issue6_2/ray/index.html; David Capitanchik & Michael Whine, Institute for Jewish Policy Research, The Governance of Cyberspace: Racism on the Internet, Policy Paper No. 2 (1996), available at http://www.jpr.org.uk/Reports/CS_ Reports/PP_2_l 996/main.htm.

. See John Kifner, Hate Groups Are Infiltrating the Military, Group Asserts, N.Y. Times, July 7, 2006. The United States Department of Defense reported that in a survey of 17,080 Army personnel, 3.5 percent were “approached to join extremist organizations since joining the Army.” News Release, Dep’t of Defense, Assistant Secretary (Public Affairs), Army Task Force Report on Extremist Activity (Mar. 21, 1996).

. As a result, restrictions on political speech in the military and in the national security context are permitted that would not be permitted in other contexts. See 18 U.S.C. § 61h (upheld in United Public Workers of America (C.I.O.) v. *460 Mitchell, 330 U.S. 75, 93, 67 S.Ct. 556, 91 L.Ed. 754 (1947)); United States Civil Serv. Comm'n v. Nat'l Ass’n of Letter Carriers, 413 U.S. 548, 556, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). Although the Hatch Act was later modified to allow increased political participation on behalf of regular government employees, this amendment does not apply to servicemembers. 5 U.S.C. §§ 7321, 7322; Hatch Act Reform Amendments of 1993, Pub.L. No. 103-94 § 2(a), 107 Stat. 1001 (1993).

. See Office of Homeland Security, The National Strategy for Homeland Security (Oct.2007).

. President Eisenhower deployed the 101st Airborne to Little Rock, Arkansas, to help integrate the public schools following Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). NAACP Legal Defense and Educational Fund, Inc., The Little Rock Nine 50th Anniversary: A page from LDF History (2007), http://www.naacpldf.org/content.aspx? article=1209 (last visited July 14, 2008). Over 75,000 service personnel were deployed to New Orleans and the Gulf Coast following Hurricane Katrina, including for the purpose of civil law enforcement on the streets of New Orleans. Pam Zubeck, NorthCom Official Lists Katrina Lessons, Colo. Springs Gazette, Oct. 22, 2005. For other examples involving the deployment of the armed forces in the domestic civil context, see Center for Law and Military Operations (CLAMO), Domestic Operational Law (DOPLAW) Handbook forjudge Advocates 55 (2001); see also Dep’t of Homeland Security, The National Response Framework (Mar. 22, 2008).

. Consider the 2008 observation of the commanding general of the United States Army Training and Doctrine Command, General William S. Wallace:
Many young Americans are willing to serve, but too little is made of the declining number of young people who are qualified to serve. This is the real story and it’s a shocking one. Only 28 percent of the 17- to 24-year-old population qualifies to wear a military uniform. The other 72 percent fail to meet minimum standards on education, character and health. Of those eligible to serve, many choose not to for a variety of reasons.
Gen. William S. Wallace, Editorial, Army General Admits U.S. Lacks Qualified New Recruits, Charlotte Observer (North Carolina), June 16, 2008, available at http://www.veterans forcommonsense.org/index.cfm/Page/Article/ID/ 10393.

. By point of constitutional comparison, I would reach a different result with respect to those portions of the charge that related to Appellant's e-mail exchanges with Investigator Sturm posing as “Country Bumpkin,” a feigned fellow traveler on the path of racist extremism, if these e-mails were still in legal play. While the e-mails were entered into evidence and may serve to inform judgments about the meaning and intent of the AOL profiles, they cannot serve as independent basis for an Article 134(2), UCMJ, conviction. Distasteful as their content may be, the messages do not cross the line into incitement, conspiracy, or attempt. Nor are they service discrediting. These e-mails were private communications between two apparently like-minded individuals, engaged in conversation.

. John Keenan, Editorial, The Image of Marines, Marine Corps Gazette, May 2008, at 3.